Frederick HOPTOWIT, Rick Rinier, Steven Hopkins, David Rivera, Robert Smith, Leo Victoria, Tim Adamson, Larry Camarillo, Daniel Atteberry, Carl Harp, Gary Isaacs, Lynn Brooks, Daniel Clark, Manuel Rampola, John Wait, and Kenneth Holden, Plaintiffs-Appellees,

v.

Dixy Lee RAY, Gerald Thompson, John Shaughnessey, Robert Tropp, W. Edward Naugler, M.D., James Spalding, Larry Kinchloe, James Cummins, Stanley Hansen, Donald Talbot, Robert Benzel, Charles Crow, Parley Edwards, Zane Massaro, Philip Mathieson, Raymond Miears, Patrick Nugent, Randy Patterson, Richard Piver, Richard Pontsler, and Geoffrey Proctor, Defendants-Appellants.

No. 80–3366.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 6, 1981.

Decided Feb. 16, 1982.

Rehearing and Rehearing En Banc Denied Aug. 9, 1982.

William C. Collins, Sr., Asst. Atty. Gen., Olympia, Wash., argued for defendants-appellants; Carol A. Smith, Asst. Atty. Gen., Olympia, Wash., on brief.

John B. Midgley, Seattle, Wash., argued, for plaintiffs-appellees; Steve Scott, Seattle, Wash., on brief.

Before WALLACE and TANG, Circuit Judges, and INGRAM,* District Judge.

WALLACE, Circuit Judge:

Certain inmates at the Washington State Penitentiary (the penitentiary) brought suit against the Governor of the State of Washington and various officials of the State of Washington corrections system (the State), alleging that conditions at the penitentiary amounted to cruel and unusual punishment in violation of the Eighth Amendment,[1] which applies to the states through the Fourteenth Amendment. *See Robinson v. California*, 370 U.S. 660, 666, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962). Among the conditions attacked by the inmates were overcrowding, inadequate medical care, increasing violence, the continuation of a lockdown, insufficient and poorly trained guards, improper classification of inmates, torturous conditions in the isolation, segregation, and protective custody units, inadequate physical plant, and inadequate vocational, educational, and recreational opportunities. We will examine the evidence relevant to these allegations as we analyze the district judge's findings.

The district judge certified the inmates' class, pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure as "[a]ll persons presently or who will in the future be confined at the Washington State Penitentiary." The district court, *sua sponte*, appointed the Department of Justice and the United States Attorney for the Eastern District of Washington as amicus curiae. After trial, which, at the district judge's direction, consisted primarily of the introduction of affidavits and depositions into evidence, the court found the penitentiary constitutionally deficient in a number of areas and awarded broad injunctive relief.

We affirm in part, reverse in part, vacate in part, and remand.

I

*Scope of Review*

A. *Jurisdiction.*

The inmates brought their action pursuant to 42 U.S.C. § 1983 and various sections of Title 72 of the Revised Code of Washington (RCW). The district court had jurisdiction over the section 1983 claim pursuant to 28 U.S.C. § 1343, and over the state claims pursuant to its pendent jurisdiction.[2] *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). We have jurisdiction on appeal from the final judgment of the district court pursuant to 28 U.S.C. § 1291.

B. *Standards of Review.*

We must defer to the findings of fact made by the district judge unless they are clearly erroneous. Fed.R.Civ.P. 52(a). We may not hold a finding clearly erroneous unless the record leaves us with a definite and firm conviction that a mistake has been made. *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948). We can freely review the district court's conclusions of law. *Miller v. United States*, 587 F.2d 991, 994 (9th Cir. 1978). In reviewing the scope of the injunctive relief awarded by the district court, we observe that district courts have broad discretion to fashion remedies once constitutional violations are found. *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971). This discretion is not unchecked, however, and we may reverse if the district judge has abused his discretion

---

* Honorable William A. Ingram, United States District Judge, Northern District of California, sitting by designation.

1. The complaint also stated other claims, including claims for money damages for loss of personal property. The Eighth Amendment claims for injunctive relief which applied to part of the complaint were severed for trial, and these are the only issues that are before us.

2. Neither party has suggested that we abstain from deciding the constitutional issues until the state courts can decide the state claims. From what we have before us, we are not persuaded that abstention is appropriate in this appeal, because resolution of state law issues would not eliminate the bulk of the federal constitutional claims. *See Manney v. Cabell*, 654 F.2d 1280 (9th Cir. 1980).

in fashioning a remedy. *See id.* at 15–16, 91 S.Ct. at 1275–76. The abuse of discretion standard is appropriate also for the review of various procedural rulings that are raised on this appeal. *See Chicago, M., St. P. & Pac. R.R. Co. v. Poarch,* 292 F.2d 449, 452 (9th Cir. 1961).

### C. Scope of Judicial Review.

 In entertaining a cause of action alleging Eighth Amendment violations in a state prison, federal courts must be cognizant of the limitations of federalism and the narrowness of the Eighth Amendment. Federal courts lack the power to interfere with decisions made by state prison officials, absent constitutional violations. Courts must recognize that the authority to make policy choices concerning prisons is not a proper judicial function. *Bell v. Wolfish,* 441 U.S. 520, 562, 99 S.Ct. 1861, 1886, 60 L.Ed.2d 447 (1979). Any needed prison reform is an executive and legislative responsibility. The function of a court is limited to determining whether a constitutional violation has occurred, *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 2400–01, 69 L.Ed.2d 59 (1981), and to fashioning a remedy that does no more and no less than correct that particular constitutional violation. *See Swann v. Charlotte-Mecklenburg Bd. of Educ., supra,* 402 U.S. at 16, 91 S.Ct. at 1276.

 The Eighth Amendment is not a basis for broad prison reform. It requires neither that prisons be comfortable nor that they provide every amenity that one might find desirable. *Rhodes v. Chapman, supra,* 101 S.Ct. at 2400; *Wolfish v. Levi,* 573 F.2d 118, 125 (2d Cir. 1978), *rev'd on other grounds sub nom., Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Rather, the Eighth Amendment proscribes the "unnecessary and wanton infliction of pain," which includes those sanctions that are "so totally without penological justification that it results in the gratuitous infliction of suffering." *Gregg v. Georgia,* 428

U.S. 153, 173, 183, 96 S.Ct. 2909, 2925, 2929, 49 L.Ed.2d 859 (1976). *See also Rhodes v. Chapman, supra,* 101 S.Ct. at 2399. This includes not only physical torture, but any punishment incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958). *See also Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). In determining whether a challenged condition violates "evolving standards of decency," courts may consider opinions of experts and pertinent organizations. But these opinions will not ordinarily establish constitutional minima. What experts may consider desirable may well constitute appropriate goals to which the other branches may aspire but they do not usually establish those minimums below which the Constitution establishes a prohibition. *See Rhodes v. Chapman, supra,* 101 S.Ct. at 2400 n.13. Indeed, they weigh less heavily in this determination than what the general public would consider decent. *Id.*

### D. Analytical Framework.

In analyzing claims of Eighth Amendment violations, the courts must look at discrete areas of basic human needs. As we have recently held, " '[A]n institution's obligation under the eighth amendment is at an end if it furnishes sentenced prisoners with adequate food, clothing, shelter, sanitation, medical care, and personal safety.' " *Wright v. Rushen,* 642 F.2d 1129, 1132–33 (9th Cir. 1981) (*Wright*), *quoting Wolfish v. Levi, supra,* 573 F.2d at 125.

 In assessing claims of Eighth Amendment violations, and equally importantly, in tailoring a proper remedy, we must analyze each claimed violation in light of these requirements. Courts may not find Eighth Amendment violations based on the "totality of conditions" at a prison. *Wright,* 642 F.2d at 1132.[3] There is no

---

**3.** In *Rhodes v. Chapman,* the Supreme Court observed that "conditions other than those in *Gamble* [denial of medical care] and *Hutto*

[deprivation of basic human needs, including adequate nourishment], alone or in combination, may deprive inmates of the minimal civi-

Eighth Amendment violation if each of these basic needs is separately met. If a challenged condition does not deprive inmates of one of the basic Eighth Amendment requirements, it is immune from Eighth Amendment attack. A number of conditions, each of which satisfy Eighth Amendment requirements, cannot in combination amount to an Eighth Amendment violation.

■ As we have said, however, "[E]ach condition of confinement does not exist in isolation; the court must consider the effect of each condition in the context of the prison environment, especially when the ill-effects of particular conditions are exacerbated by other related conditions." *Id.* at 1133. This is no more than a recognition that a particular violation may be the result of several contributing factors. "But the court's principal focus must be on specific conditions of confinement. It may not use the totality of all conditions to justify federal intervention requiring remedies more extensive than are required to correct Eighth Amendment violations." *Id.* To find an Eighth Amendment violation, courts must identify specific conditions that fail to meet Eighth Amendment requirements. We cannot rely on a vague conclusion that the "totality of conditions" violates the Eighth Amendment.

■ *Wright* is also critical to the determination of an appropriate remedy. Arguably, under the "totality of conditions" approach, courts may be justified in ordering broad remedies to correct all the conditions that combine to create the "violation." Under our approach, only the specific conditions that violate the Constitution may be remedied, and the remedy may be only so much as is required to correct the specific violation. A remedy may go beyond this only when there is a record of past constitutional violations and violations of past court

orders. *See Hutto v. Finney,* 437 U.S. 678, 687, 98 S.Ct. 2565, 2571, 57 L.Ed.2d 522 (1978).

■ In ordering a remedy, courts must consider the cost of compliance and the effect on legitimate security needs of the prison. *Wright,* 642 F.2d at 1134. Courts should consider bona fide steps that prison officials are taking to alleviate poor prison conditions. This is not to say that such steps necessarily obviate the need for a remedy. Rather, the court should defer to the policy choices made by prison officials and order a remedy consistent with the basic approach taken by prison officials, unless that approach itself is inconsistent with the Eighth Amendment. *See Bell v. Wolfish, supra,* 441 U.S. at 562, 99 S.Ct. at 1886.

## II

### *The District Court's Eighth Amendment Findings, Conclusions, and Remedies*

The district court made 230 findings of fact, categorized by challenged condition. The court concluded that "[a]lthough each instance of maltreatment may not rise to the level of a constitutional violation, the Court may properly conclude that conditions, taken as a whole, do rise to that level." This was error. The district judge also made conclusions based on each challenged condition. To the extent that he concluded that a particular condition was a constitutional violation because it merely contributed to the totality of conditions which he decided violated the Eighth Amendment, the district court erred and we reverse. *Wright.* In many instances, however, the district court concluded that a particular condition standing alone was a violation of the Eighth Amendment. We now turn to a discussion of each of these conclusions and the findings on which they were based.

lized measure of life's necessities." 101 S.Ct. at 2399. We do not believe this relatively brief statement dictates a change from our position in *Wright.* The opinion suggests that deprivations of essential food, medical care, sanitation, and safety may constitute Eighth Amendment violations. In light of the Court's specificity, it

is unlikely the Court would hold that the totality of conditions at a prison may constitute an Eighth Amendment violation. The *Rhodes'* rationale suggests that the Court would require evidence of specific conditions amounting to one of the enumerated deprivations.

A. *Overcrowding.*

The district court found that the penitentiary's lowest population in recent history was between 1000 and 1100. The State rated the capacity of the penitentiary at 872, broken down as follows:

| Wing | Cell Size (sq. ft.) | Number of Cells | Number of Beds per Cell | Rated Capacity | Square Feet per Prisoner |
|------|------|------|------|------|------|
| 4 | 48.8 | 128 | 1 | 128 | 48.8 |
| 5 | 48.8 | 128 | 1 | 128 | 48.8 |
| 6 | 127.5 | 102 | 2 | 204 | 63.75 |
| 7 | 102.5 | 54 | 2 | 108 | 51.25 |
| 8 | 130.0 | 102 | 2 | 204 | 65.0 |
| Adm. | 52.5 | 70 | 1 | 70 | 52.5 |
| | 68.5 | 30 | 1 | 30 | 68.5 |
| Segr. | 52.4 | 100 | 1 | 100 | 52.4 |

Less 100 cells for short-term security requirements

Total Capacity = 872

The district court found that many of the cells violated the minimum standards set out by the American Correctional Association (ACA) for humane and decent confinement. The ACA standards require that each prisoner have 60 square feet of space, unless more than 10 hours per day are spent in the cell, in which case 80 square feet per inmate is required. The district court found that cells in 5-wing, 7-wing, and the segregation wing must meet the 80 square foot standard because inmates spend excessive amounts of time in their cells. Thus, none of these cells, as currently rated, satisfies the ACA requirements. Further, the district court found that the cells in 4-wing and the smaller cells in the admissions wing do not satisfy the 60 square foot standards. Thus, the district court would re-rate the penitentiary's capacity at less than 492, as follows:

| Wing | Cell Size (sq. ft.) | Number of Cells | Number of Beds per Cell | Rated Capacity | Square Feet per Prisoner |
|------|------|------|------|------|------|
| 6 | 127.5 | 102 | 2 | 204 | 63.75 |
| 7 | 102.5 | 54 | 1 | 54 | 102.5 |
| 8 | 130.0 | 102 | 2 | 204 | 65.0 |
| Adm. | 68.5 | 30 | 1 | 30 | 68.5 |

Total Capacity = 492

Less some number of beds for short-term security requirements

The district court found that the cells in 6, 7, and 8-wings each contained four beds. Most of the cells housed three inmates, and some housed four. The district judge made no findings concerning the amount of time that prisoners normally spend in their cells, except to the extent that he determined which cells fell under the 80 square foot ACA requirement and which cells fell under the 60 square foot requirement.

■ Overcrowding is often the root cause of many of the complaints made by prisoners. *See Lareau v. Manson,* 651 F.2d 96, 98 (2d Cir. 1981). In this case, the inmates alleged that "[t]he crowding of the Penitentiary beyond capacity directly con-

tributes to the effects of every deficiency in the Penitentiary's operation described in this Complaint." Overcrowding itself is not a violation of the Eighth Amendment. It can, under certain circumstances, result in specific effects which can form the basis for an Eighth Amendment violation. Overcrowding can cause increased violence, *see Wolfish v. Levi, supra,* 573 F.2d at 127, it may dilute other constitutionally required services such that they fall below the minimum Eighth Amendment standards, and it may reach a level at which the shelter of the inmates is unfit for human habitation.

■ The district court erred in failing to consider the effect of the alleged overcrowding at the penitentiary in the areas that are constitutionally protected. Rather, the district court constitutionalized the ACA standards. The district judge failed to analyze how much time the prisoners must spend in their cells each day. If prisoners need not remain in their cells for a substantial part of the day, analysis of square footage in cells may be largely irrelevant. The district judge also failed to determine whether any increased violence was out of proportion to the increase in population itself, *see Rhodes v. Chapman, supra,* 101 S.Ct. at 2399, or, beyond conclusory and general statements, what other constitutional deprivations were caused by overcrowding. It is only in light of these other factors that an Eighth Amendment claim based on overcrowding can be evaluated. It is certainly error to rely exclusively on per capita square footage recommendations. *See generally Rhodes v. Chapman, supra.*

■ On the record before us, it is impossible to determine precisely what the effects of overcrowding are at the penitentiary. It is entirely possible that the penitentiary is indeed overcrowded beyond levels permitted by the Eighth Amendment. We remand to the district court for further findings on the overcrowding issue. On remand, the district judge must consider and make findings pertinent to the effects of overcrowding. He must not rely solely on square footage, and he must determine

at what point the population itself becomes an unnecessary or wanton infliction of pain. The district judge should especially reconsider his initial finding that this number was about half the prison's rated capacity. In light of *Rhodes v. Chapman,* we doubt, absent extraordinary circumstances, that this figure will, in this case, be less than the rated capacity of the prison. Indeed, it may well be somewhat higher. What the State sets as a rated capacity is relevant evidence but does not establish the constitutional minimum. The district judge, in his reconsideration, will need to heed the clear direction set by the Court in *Rhodes v. Chapman,* that the Eighth Amendment does not reflect what any of us in the judicial branch might believe to be desirable, but rather requires a mere minimum standard of life's necessities.

### B. *Violence and Guard Behavior.*

The district court found high levels of violence at the penitentiary, both among inmates and between inmates and guards. The district judge described the atmosphere at the prison as "potentially explosive." The findings on this issue included:

1. In the two years preceding the district court's opinion, eight inmates and two guards were killed, and prison officials imposed three lockdowns to curb violence.

2. The level of violence was caused by overcrowding, idleness, deteriorating physical plant, inadequate medical care, and "other conditions." The prisoners were suffering from psychological deterioration, which created an atmosphere of fear, anger, and frustration in the prison.

3. There was a pattern and practice of brutality and harassment by the prison guards. To a great degree, the incidents of alleged guard brutality occurred during the lockdown during the summer of 1979. We shall consider the lockdown as a separate issue. Nonetheless, guard brutality was the norm. It was encouraged by peer pressure among the guards and facilitated by indifference on the part of the administration. Guard brutality included arbitrary shake-

downs and theft and destruction of the private property of inmates.

4. "The policy and programs at the penitentiary for guard recruitment, screening, staffing, supervision, evaluation, and training [were] inadequate." As a result, the prison staff as a whole was not sufficiently "competent, professional, [or] ethnically balanced." The recruiting program drew a predominantly white, rural prison staff, in contrast to the largely minority, urban inmate population. The screening program was inadequate to find persons suited to perform corrections work. The recruiting program was inadequate to obtain the proper number of prison staff. The prison guards were inadequately trained and supervised.

5. The penitentiary lacked an adequate grievance mechanism. The inmates legitimately believed that they were unable to contact the administration to complain about the excesses of guards. As a result, prisoners sought redress of their grievances informally and often destructively. The administration had, however, made some effort to establish adequate procedures. The court found, however, that these procedures were inadequate.

The district court concluded that the level of violence at the penitentiary indicated that the State had failed in its constitutional duty to protect prisoners from harm. In addition, the court concluded that the State failed in its obligation to provide an adequate correctional staff. The court enjoined the State from using unnecessary

physical force against prisoners and ordered it to supervise the penitentiary in such a way that excessive and unnecessary physical force and abusive language are not used. In addition, the court ordered the State to submit a plan to the special master for the improvement of recruiting, screening, selection, and training programs. The court also ordered the State to add a sufficient number of prison guards and to submit a plan for an adequate grievance mechanism to the special master.

 Prison officials have a duty to take reasonable steps to protect inmates from physical abuse. *Ramos v. Lamm*, 639 F.2d 559, 572 (10th Cir. 1980), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981). The level of violence at the penitentiary supports the district judge's finding that the State has been deliberately indifferent to the safety needs of the inmates. The State argues that it has taken a number of steps to reduce the level of violence at the penitentiary. Nonetheless, the district judge's finding that an atmosphere of fear of excessive violence continues to exist at the penitentiary is not clearly erroneous. Therefore, we affirm the district judge's conclusion that the level of violence at the penitentiary constitutes cruel and unusual punishment.

 In other respects, however, the district court went too far. The district court concluded that the Constitution requires testing, training, and various other programs for guards.[4] Lack of these pro-

---

4. The concurring opinion disputes our reading of the district judge's disposition and suggests that the district judge may have ordered these programs, not because he believed them to be constitutionally necessary in and of themselves, but because he believed that they were necessary to remedy the high level of violence at the prison. The position of the concurring opinion, however, is inconsistent with the district court's characterization of the issues in this case. With regard to guard programs, the only issues before the court were "whether, in their totality, the conditions of confinement at Washington State penitentiary constitute cruel and unusual punishment, in violation of the Eighth Amendment to the United States Constitution" and whether they violated Wash-

ington State law. Responding to these issues, the district judge made detailed findings of fact, discussing each suspect condition in turn. The court's findings of fact with respect to violence, findings 15 to 21, were separate from its findings with respect to guard behavior, findings 22 and 23. The district judge found that "[t]he high level of violence resulted from: (1) chronic conditions of extreme overcrowding; (2) idleness; (3) deteriorating physical plant; (4) inadequate medical, psychiatric and psychological care; and (5) other conditions found herein." The concurring opinion does not suggest that the district court's order requiring population reduction, increased work and study programs, and compliance with professional association standards for prison facilities and care was

grams does not amount to an infliction of pain and so is not condemned by the Eighth Amendment. Courts may require prison officials to hire a sufficient number of guards to meet safety needs, depending on the number of prisoners and the structure of the prison. *See Williams v. Edwards,* 547 F.2d 1206, 1213 (5th Cir. 1977). Courts may also order prison officials to take steps to protect the inmates from the guards themselves. Physical brutality cannot be part of the daily routine. Rather, guards may use force only in proportion to the need in each situation. *See Spain v. Procunier,* 600 F.2d 189, 195 (9th Cir. 1979). The district court may find excess physical force an Eighth Amendment violation, may order guards to refrain from using such force, and may order prison officials to take steps to prevent guards from such activities. But to require prisons to have adequate recruiting, screening, and training programs is an impermissible judicial involvement with the minutiae of prison administration. *See Bell v. Wolfish, supra,* 441 U.S. at 562, 99 S.Ct. at 1886.

 The district judge made no conclusion concerning the lack of a grievance mechanism, though he found that such a mechanism was necessary. In addition, the district judge ordered the State to establish a grievance procedure. For the court's order that guards cease physical abuse of inmates to be effective, the inmates must have some means to report violations. The court's finding that such a mechanism must include review by noncorrectional personnel, participation by both staff and inmates, written responses, and outside evaluation goes beyond the scope of what is necessary to prevent physical brutality. In this regard, the district judge has overstepped the bounds of the Eighth Amendment.[5] We remand this issue to the district court to determine whether the steps already taken by the State comport with the Eighth Amendment minimum standards, and, if not, what further steps are necessary.

 We therefore affirm the district judge's conclusion that the level of physical brutality violates the Eighth Amendment, hold that he erred in his conclusion that failure to have adequate recruitment, screening, and training programs is a violation of the Eighth Amendment, and remand the issue of a grievance mechanism for further proceedings.

### C. Racism.

The district judge made findings concerning racism in connection with violence at the penitentiary. He made no conclusions of law regarding racism, but he did include racism as an element of his order. He ordered the State to submit "a detailed plan to eliminate racism at WSP."

 Without having found an Eighth Amendment violation, the district judge was without power to make an order with respect to racism. Even if we accepted the district judge's findings of fact re-

---

intended to address the unconstitutionally high levels of violence at the prison. At the same time, however, the concurrence seems to conclude that the district court's order with respect to guard behavior was intended to address the levels of violence.

We acknowledge the presence of some language in the district court disposition which could be construed to mean that the district judge believed that the mandated guard programs would help reduce violence at the prison. That alone, taken out of the context of the entire disposition, does not conclusively demonstrate his reasons for mandating the programs. We observe that the district judge also stated that the absence of vocational and academic education and of drug and alcohol counseling contributed to violence at the facility. He probably believed that mandated programs

in these areas would also help reduce violence. We are, nevertheless, not convinced that he mandated any of these programs because he deemed them necessary to alleviate constitutionally impermissible levels of violence in the prison. We are persuaded by the record that he mandated them because he erroneously concluded that the "totality of conditions" at the penitentiary violated the Eighth Amendment and that each contributing condition had to be changed.

5. The prisoners have not raised, and we do not consider, what, if any, due process rights they may have to such a grievance mechanism. We consider only whether the lack of a grievance mechanism constitutes cruel and unusual punishment.

garding racism as conclusions of law, however, we could not affirm his grant of relief. The district judge found that the prison staff did not reflect the racial characteristics of the inmate population. In addition, the district judge found that prisoners were assigned to wings on the basis of race, that prison guards had done nothing to quell racial tensions among inmates, and that prison guards were so insensitive to problems of racism that they used racial slurs to harass prisoners. The district judge found that much of the violence at the penitentiary was racially motivated.

We have already affirmed the district judge's order that the State stop any acts of unnecessary violence at the penitentiary. Beyond this, the district judge did not have any question of racism before him. The complaint contained no allegation of violations of equal protection or due process on the basis of unequal treatment by race. It was error for him to address questions of disparate treatment of races.[6] It was certainly error for him to address any racial discrimination in the hiring of guards. There is a question whether the inmates have standing to raise such claims. Once the district judge took steps to end violence at the prison, racism was no longer before him. Even if it were, his order that the State "end racism" is overbroad. The district judge had the power only to remedy Eighth Amendment violations. He could have required the State to cease certain practices, but not to eliminate attitudes.

### D. Medical Care.

The district court found the medical care at the penitentiary constitutionally deficient for a number of reasons. The court made detailed factual findings. These findings included:

1. Medical staffing is inadequate. Medical services are provided by nurse practitioners or physician assistants (mid-level practitioners), rather than physicians. There is no full-time chief medical officer. There are inadequate numbers of mid-level practitioners and inadequate physician supervision of mid-level practitioners. "Hospital supervisors" examine patients, diagnose illnesses, refer patients to physicians, dispense medications, and treat less serious illnesses, even though they are not licensed to do this and are inadequately trained.

2. The organization and administration of the medical care system is inadequate, and there are few, if any, written procedures.

3. Access to the medical care system is inadequate. Sick call is not conducted on a daily basis, and preliminary procedures at sick call often cause denial or delay of necessary medical care. Access to medical care via the "kite" system (inmate sends note requesting care) results in preliminary determinations being made without examination of the patient. Thus, often prisoners needing medical care are denied access to it. Further, the penitentiary lacks adequate procedures for dealing with medical emergencies, including poor transportation and inadequate arrangements with community medical facilities.

4. Much discretion to decide which prisoners will get access to medical care is vested in the guards. Often, guards fail to forward medical complaints and use their discretion as leverage over the inmates. Guards regularly fail to provide required escorts to inmates to go to the medical facilities.

5. Medication is prepared and dispensed by persons not trained or licensed to do so. The medication distribution system at the penitentiary often results in the denial or delay of distribution of proper medication.

6. The medical records system is deficient. Prisoners' medical histories are often not kept. Medical histories are not re-

---

**6.** Although the concurring opinion argues that the order with respect to racism was intended to ameliorate violence, the district judge's formulation of the issues indicates that his concern was with racism as a constitutional violation. The district judge stated the racism issue as follows: "whether inmates at Washington State Penitentiary are segregated by race and, thereby, denied their right to equal protection of the laws, in violation of the Fourteenth Amendment to the United States Constitution." See also Footnote 4, supra.

viewed when a prisoner enters the penitentiary.

7. The penitentiary lacks preventive health care, routine medical or dental examinations, and health education. Special dietary needs are not being met.

8. Medical facilities are ill-equipped and too small.

9. The penitentiary lacks basic psychiatric and mental health care. Staff and programs are insufficient; administration and medication are inadequate.

The district judge concluded that the system of medical care at the penitentiary was constitutionally deficient because it showed a deliberate indifference on the part of the State to the health care of the prisoners. The court ordered the State to bring the health care system at the penitentiary into compliance with the standards set forth by the American Public Health Association and the American Medical Association.

 To the extent that the findings of fact describe conditions existing at the penitentiary, they are not clearly erroneous. Some of the findings, however, prescribe the necessary levels of medical care at the prison. For example, the district judge found, "At a minimum, staff should include the equivalent of two full time physicians, one of whom serves as a full time chief medical officer responsible for medical decisions." These are not findings of fact, but rather conclusions of law because they purport to describe the minimum standards required by the Eighth Amendment.

 Based upon the findings of fact the district court did not err in concluding that the medical services provided at the penitentiary are so deficient that they reflect a deliberate indifference to the serious medical needs of the prisoners and therefore constitute a violation of the Eighth Amendment. *See Estelle v. Gamble, supra,* 429 U.S. at 104, 97 S.Ct. at 291. The Eighth Amendment requires that prison officials provide a system of ready access to adequate medical care. Prison officials show deliberate indifference to serious medical needs if prisoners are unable to make their

medical problems known to the medical staff. *See id.* at 103–04, 97 S.Ct. at 290–91. Access to the medical staff has no meaning if the medical staff is not competent to deal with the prisoners' problems. The medical staff must be competent to examine prisoners and diagnose illnesses. It must be able to treat medical problems or to refer prisoners to others who can. Such referrals may be to other physicians within the prison, or to physicians or facilities outside the prison if there is reasonably speedy access to these other physicians or facilities. In keeping with these requirements, the prison must provide an adequate system for responding to emergencies. If outside facilities are too remote or too inaccessible to handle emergencies promptly and adequately, then the prison must provide adequate facilities and staff to handle emergencies within the prison. These requirements apply to physical, dental and mental health.

 The conclusions reached by the district judge and the remedy ordered pertaining to the necessary minimum levels were overbroad. It was error for the district judge to constitutionalize the standards of the American Medical Association and the American Public Health Association. The district judge had the power only to correct the constitutional defects that he found. A higher standard may be desirable but that responsibility is properly left to the executive and legislative branches. The remedy of the court could go no farther than to bring the medical services up to the constitutional minima.

 We recognize that in the area of medical services, substantial changes were necessary at the penitentiary. Nonetheless, there is more than one way in which the State could provide necessary medical services. By ordering the hiring of full time physicians and improvements in internal recordkeeping, the district judge failed to take into account the approach taken by the State in providing medical services. That is, the State asserts that it sought to provide an "infirmary" rather than a "hospital," with additional services being provided

outside the prison. Consistent with the deference that the courts must give to state prison authorities and the consideration that must be given to the costs of remedies, the district judge erred in failing to consider the approach taken by the state prison authorities. The district judge could find that in-prison staff was necessary if he found that the State's approach was necessarily inadequate. He made no findings, however, concerning the availability and adequacy of treatment outside the prison. It could well be that with improved mid-level staffing in the prison, improved transportation, and an adequate plan for medical treatment in the community, the approach taken by the State would be constitutionally permissible. Before the district judge ordered the prison to hire in-house physicians and effectively scrap its approach to medical services, he should have first determined that this approach could not meet the constitutional minimum. Absent such a finding, the district court should have ordered the prison officials to improve the in-house staffing and procedures within the framework of the penitentiary's approach to medical services.

We therefore affirm the district court's holding that the medical services provided at the penitentiary violate the Eighth Amendment. We reverse and remand the district judge's conclusions concerning the specific levels of staff and programs required by the Eighth Amendment. We further reverse the district court's order that the penitentiary must comply with American Medical Association and American Public Health Association standards. On remand, the district judge must formulate a new remedy to correct the constitutional violations that he has found. The new remedy should be no broader than is necessary to correct constitutional violations and should permit, if possible within constitutional restraints, the prison officials to use the general approach that they find most effective and efficient.

### E. *Idleness.*

The district court found that the penitentiary has insufficient programs, jobs, and educational opportunities. The court found that this causes a high level of idleness among prisoners, which in turn leads to frustration, anger, and violence. Further, the opportunities that do exist are inadequate to be of any use to the inmates after their release from the penitentiary. Therefore, the court found that the programs, jobs and educational opportunities are inadequate to serve any rehabilitative purpose. The court concluded:

> Defendants have a constitutional duty to provide inmates sufficient exercise, recreation, and out-of-cell activities to prevent their degeneration and to protect their mental and physical well being.... Insufficient vocational and academic education, deficient classification,[7] inadequate access to counselling (including drug and alcohol counselling), excessive time locked in cells, and menial and inadequate employment at the Washington State Penitentiary contribute to violence and constitute an integral part of the Eighth Amendment violations.

(Citations omitted and footnote added.) Curiously, the district court also concluded that there was insufficient evidence to find the vocational and educational programs unconstitutional. The court ordered the State to implement adequate vocational, recreational, and educational programs at the penitentiary. The court further ordered the State to develop programs such that each prisoner has "the opportunity to participate in a transitional program designed to aide (sic) the prisoner's reentry into society."

Ignoring the inconsistency in the district court's conclusions, the district court erred in ordering relief. Idleness and the lack of programs are not Eighth Amendment violations. The lack of these programs simply does not amount to the

---

**7.** The district judge treated classification separately, aside from this language, and we shall treat it separately in our opinion.

infliction of pain. *Rhodes v. Chapman, supra*, 101 S.Ct. at 2399. There is no constitutional right to rehabilitation.[8] *See Newman v. Alabama*, 559 F.2d 283, 287 (5th Cir. 1977), *rev'd on other grounds sub nom., Alabama v. Pugh*, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978).

■ Aside from the constitutional challenge, the district judge also concluded that the lack of rehabilitative, vocational, and work programs violated state law. Washington law provides that prison officials must establish "programs and procedures for convicted persons ... which are designed to be corrective, rehabilitative and reformative of the undesirable behavior problems of such persons." RCW § 72.08.-101. It further directs that prison officials have a "duty to provide for the useful employment of prisoners in the adult correctional institutions." *Id.* § 72.64.010. *See also* RCW §§ 72.01.150, 72.62.010 *et seq.*

We need not reach the question of whether the district court's interpretation of Washington law is correct. We must vacate the district court's state law determination and remand for further proceedings. The district court's conclusions on state law are, on the present record, insufficient. There is dicta in a Washington Supreme Court case that indicates that the right to rehabilitation created by RCW § 72.08.101 reflects the legitimate government interest in rehabilitating prisoners, but creates no enforceable right in the prisoners to such rehabilitation. *Bresolin v. Morris*, 88 Wash.2d 167, 170–71, 558 P.2d 1350, 1352 (1977). One interpretation of this language is that prisoners have no standing to raise the state's failure to provide rehabilitation programs. The district judge failed to con-

sider this issue, and we remand so that he may.

### F. Classification.

The district court found that the classification procedures of the penitentiary are inadequate. This results in overclassification of a substantial number of prisoners, such that these prisoners are placed in maximum custody, when lesser degrees of custody would suffice. The principal reasons for this are that there are insufficient staff members to give adequate time to each case, and staff members are inadequately trained. According to the court's findings, unnecessarily placing prisoners in maximum custody increases the probabilities of re-offense and escape and decreases the possibility of rehabilitation. The court ordered the State to submit plans for reclassifying all present prisoners and for reception and orientation programs for new prisoners.

■ The district court did not conclude that the inadequate classification system itself violated the Eighth Amendment. Rather, it concluded that the system so contributed to the potential for violence and the hindrance of rehabilitation programs that it was a part of the Eighth Amendment violation. We interpret this conclusion to mean that the district court considered the classification system as part of the "totality of conditions" that amounted to the Eighth Amendment violations at the penitentiary.[9] As we have said, this approach is incorrect under *Wright*. If a condition does not itself create a deprivation in one of the areas that the Eighth Amendment protects, it cannot be held an Eighth Amendment violation, and a court cannot

8. We have recently held that persons committed for mental incapacity have a constitutional right to adequate rehabilitative treatment. *Ohlinger v. Watson*, 652 F.2d 775 at 778–79 (9th Cir. 1981). The rationale of *Ohlinger* does not extend to those serving criminal sentences. Indeed, *Ohlinger* supports the proposition that those serving criminal sentences have no constitutional right to rehabilitation. In *Ohlinger*, the prisoners "could be held indefinitely as a result of their mental illness, while those convicted and sentenced under the State [criminal

law] need only serve the ... maximum term." *Id.* at 779. Incarceration for criminal offenses "is primarily for punitive purposes. Although rehabilitation may be desirable, it is not necessarily the primary function of such incarceration." *Id.* at 778.

9. Our interpretation of the district court opinion on this issue differs with that of the concurring opinion. The reasoning for our position is essentially the same as that pertaining to guard behavior. *See* Footnote 4, *supra.*

order a remedy. In addition, misclassification does not itself inflict pain within the meaning of the Eighth Amendment. *See Gibson v. Lynch*, 652 F.2d 348, 352 (3d Cir. 1981); *Ramos v. Lamm, supra*, 639 F.2d at 566; *Newman v. State of Alabama, supra*, 559 F.2d at 287. That part of the district court's order relating to classification is reversed.

### G. *Physical Plant.*

The district judge found that the physical plant at the penitentiary was "old, dilapidated, and ill-maintained." These conditions were found to "have serious health implications for inmates and staff." More specifically the district judge found:

1. Overcrowding posed an increased threat of the transmission of communicable diseases. Cell sizes as prescribed by the ACA were required.

2. Lighting was substandard. This caused eye strain and fatigue and hindered attempts to ensure that basic sanitation was being maintained.

3. Plumbing was unsatisfactory and presented a threat of waste water contamination of drinking water.

4. Fire prevention was substandard, creating danger of fire in most living areas.

5. Food service did not meet public health standards. Problems included temperatures at which food is stored, rodents, and unsanitary conditions.

6. There was evidence of vermin infestation throughout the prison.

7. The prison lacked an effective preventive maintenance program.

8. Ventilation was inadequate and air was generally dank.

9. There were serious safety hazards in occupation areas.

10. Cell cleaning supplies were inadequate and often unavailable.

The district judge concluded that "the general condition of the Penitentiary's physical facilities when considered in their totality . . . falls below minimum standards of decency and conditions of confinement and violates Plaintiffs' Eighth Amendment rights." The district judge also concluded that there was insufficient evidence to make a separate finding of the unconstitutionality of the food services at the prison.

Despite the State's strong objections, we are unable to say that any of the findings of fact, except the one alluding to overcrowding, is clearly erroneous. Although we might have come to a different result if our task had been to weigh the evidence anew, there is adequate evidence in the record to support the findings. We are not left with the firm conviction that a mistake has been made. We have already discussed overcrowding and need not do so again here.

We must, however, reverse the district court's conclusion of law. The district judge improperly applied the "totality of conditions" approach to his findings concerning the physical plant. The district judge made a specific conclusion that the food services alone did not violate the Constitution, but failed to consider whether each of the other conditions standing alone would violate the Constitution. Under *Wright*, he must on remand consider each finding and decide whether each condition amounts to an unnecessary and wanton infliction of pain. Of course, each condition can be considered in light of other conditions. But the findings of fact made by the district judge appear to address distinct concerns. For example, substandard water does not exacerbate the safety violations in the occupational areas. If neither of these conditions violates Eighth Amendment standards, then the two of them together cannot amount to some overall conclusion that the prison is unsafe or unsanitary.

In addition, the district court's remedy was overbroad. The court ordered the State to bring the facilities into compliance with standards of the United States Public Health Service, the American Public Health Association, the State of Washington's Department of Health, and the American Correctional Association. Again, we emphasize that it is error to constitutionalize the stan-

dards of particular groups. The district judge may consider these standards, but must order the correction of specific violations, and may require only that these corrections bring the conditions above constitutional minima.

H. *Protective Custody and Segregation.*

The district court found that conditions in the isolation, segregation, and protective custody areas were intolerable. Among the district judge's findings concerning the segregation and isolation were:

1. Indefinite confinement creates a threat to the mental health of inmates.

2. Some of the cells, in addition to a barred door, have a solid metal door which, when closed, allows no light and little air or sound into the cell. The door has a small window that can be covered at the guard's option. Windows along the outer walls have a thickly meshed metal screening, which allows almost no light inside the cell. Cells are dimly lit. Light switches are controlled by the guards, who have sometimes left prisoners without light for days at a time.

3. Sentences to isolation are in ten day blocks. During these ten day periods, prisoners are let out of their cells only once a day for a ten minute shower. They are permitted no amenities, like reading, smoking, radio, or television, and for most of the time the solid outside door is closed. Inmates can serve additional ten day sentences, following a 72 hour break, during which they are entitled to an hour of exercise, access to reading and smoking, and the opening of the outside door.

4. Although conditions in segregation are not as bad as conditions in isolation, sentences are less definite. Prisoners may be sentenced to segregation indefinitely with committee review every 30 days. Some inmates remain in segregation for months or years. The basic differences between segregation and the general population is that segregation prisoners have no access to the law library, to advisors, or to educational, vocational, or work opportunities.

5. Access to medical staff from segregation and isolation is inadequate.

6. Segregation inmates have no clear criteria by which they can work their way out of segregation.

7. Ventilation, heating, and plumbing systems are substandard. Fire prevention is inadequate. Unsanitary conditions prevail.

With respect to protective custody, the district judge found:

1. Most protective custody prisoners are housed in 5-wing, and are visible to 4-wing prisoners who are members of the general population.

2. The number of prisoners in protective custody is unduly high.

3. There are few job opportunities, and no educational or counseling facilities available.

4. Protective custody guards subject prisoners to harassment and racial slurs.

The district judge concluded that "basic elements of a safe, healthful, and sanitary environment may not be withdrawn as a method of prison discipline." He concluded that the sensory deprivation and constriction of space and activity in isolation violated the Eighth Amendment. He specifically found that the use of the solid outer door closed for most of the day in isolation was cruel and unusual punishment. He also concluded that conditions to which protective custody inmates were subjected were cruel and unusual. He included small cells, inadequate recreation and legal access, and disqualification from prison programs as elements of the violation. He ordered the State to comply with the ACA standards relating to the housing of prisoners in segregation and protective custody.

We conclude these findings are not clearly erroneous and that the district judge did not err in his specific conclusion that the isolation cells with the closed metal doors constitute cruel and unusual punishment. The deprivation of nearly all fresh air and light, particularly when coupled

with the guard's control over the window and the electric light, creates an extreme hazard to the physical and mental well-being of the prisoner. In addition, the district judge could properly conclude that the inadequate access to medical care and inherent sanitary problems in these cells when the door and its window are closed constitute cruel and unusual punishment, and that the use of this isolation cell is an unnecessary and wanton infliction of pain, without penological justification.

The Eighth Amendment standards for conditions in isolation, segregation, and protective custody cells are no different from standards applying to the general population. Prison officials may not deprive prisoners of the basic necessities of life protected by the Eighth Amendment by placing them in different forms of detention. Prison officials must provide all prisoners with adequate food, clothing, shelter, sanitation, medical care, and personal safety. *See Wolfish v. Levi, supra,* 573 F.2d at 125. To deprive prisoners in isolation, segregation, or protective custody of any of these violates the Eighth Amendment. Of course, in considering whether a prisoner has been deprived of his rights, courts may consider the length of time that the prisoner must go without these benefits. *See Hutto v. Finney, supra,* 437 U.S. at 685, 98 S.Ct. at 2570. The longer the prisoner is without such benefits, the closer it becomes to being an unwarranted infliction of pain. *Compare Spain v. Procunier, supra,* 600 F.2d at 199 (Eighth Amendment requires prisoners confined to their cells 24 hours a day to have regular outdoor exercise) *with Hayward v. Procunier,* 629 F.2d 599, 603 (9th Cir. 1980) (such outdoor exercise can be temporarily denied when prison conditions warrant), *cert. denied,* 451 U.S. 937, 101 S.Ct. 2015, 68 L.Ed.2d 323 (1981).

It was error, however, for the district judge to examine conditions in the isolation, segregation, and protective custody units under the totality of conditions standard. It was also error for the district judge to consider the lack of prison programs in these units as elements of the violation. As we have said, such programs simply are not constitutionally required. On remand, the district judge should consider the conditions in these units, and determine whether they amount to deprivations of the constitutional minima of the areas mandated by the Eighth Amendment. In addition, again, the remedy for any specific violations that he may find must be tailored to correct the specific violation and no more obtrusive than to satisfy the constitutional minima.

### I. *The Lockdown.*

The district court found that prison officials at the penitentiary imposed a lockdown on June 15, 1979, following the killing of an inmate and a guard. The lockdown was imposed to restore order and security in light of the high level of tension and violence following the two killings. The district court found that the conditions imposed during the lockdown were in excess of what was required to restore order and security, were unrelated to a legitimate penological purpose, and were kept in effect for a longer period than necessary. The court found that the lockdown lasted over four months.

Among the conditions found by the district court to exist during the lockdown were:

1. Inmates were not allowed out of their cells for a three week period during the hottest part of the summer. Many of these cells were overcrowded. There were no showers, no laundry, no fresh linen, no cleaning supplies, no recreation, no incoming reading materials, no access to counsel or legal materials, no access to commissary, and no access to telephones.

2. During the lockdown, several shakedowns were made, during which cells and prisoners were searched thoroughly and personal property confiscated. Much of this personal property was taken, lost, or destroyed.

3. One day during the lockdown, many inmates in 8-wing tore apart the plumbing in their cells. The district court found that

this was caused by the inmates' frustration over the lockdown. These prisoners were removed from 8-wing and placed in the prison yard. In removing the inmates, the guards inflicted unnecessary physical force. While confined to the prison yard, the 8-wing prisoners "were subjected to intolerable, inhumane, and unconstitutional conditions."

4. The day after the problems in 8-wing, six prisoners in the segregation unit were handcuffed to their cell bars and later removed from their cells by the prison riot team. In so doing, the riot team used unnecessary physical force, which resulted in injury to each of the prisoners. These injuries were confirmed by subsequent medical examinations. One prisoner had to be taken to the hospital for examination of injuries caused by a guard's insertion of a nightstick into his rectum. The court found that the riot team was aware they had used unnecessary physical force and consciously attempted to cover-up their wrongdoing. Each of the members of the riot team was subsequently suspended, and five were fired.

The district court made the following conclusion of law concerning the lockdown:

> The lockdown at issue in the present case violated Plaintiffs' rights in two ways. First, the lockdown was imposed and arbitrarily continued, in large part, to regain control of the Penitentiary. The loss of control is itself a violation of plaintiffs' rights, as was the long duration of this lockdown for the purpose of regaining control. Second, the long periods of deprivation of basic amenities, with prisoners locked in their cells (four to a cell in many cases) without showers, visitation, recreation, work, counselors, laundry facilities, cleaning materials, mail, and phone, render the lockdown unconstitutional.

▪ Our Eighth Amendment analysis of the conclusions of law in the lockdown situation is much like our analysis of Eighth Amendment standards in isolation, segregation, and protective custody. That is, prison officials must meet Eighth Amendment standards in providing basic human needs to prisoners. However, when a genuine emergency exists, prison officials may be more restrictive than they otherwise may be, and certain services may be suspended temporarily. The more basic the particular need, the shorter the time it can be withheld. It is doubtful, for example, that any circumstance would permit a denial of access to emergency medical care. Less critical needs may be denied, however, for reasonable periods of time when disciplinary needs warrant. *See Spain v. Procunier, supra,* 600 F.2d at 199. In determining the existence of such needs, we must give reasonable leeway to prison officials. *Hayward v. Procunier, supra,* 629 F.2d at 603.

▪ Again, in this area, the district judge appeared to apply a totality of conditions test. The court failed to analyze which conditions violated the prisoners' rights. The court further failed to analyze when the services that were deprived were restored. The district judge's finding that the lockdown lasted four months is clearly erroneous. As the findings of fact themselves indicate, certain restrictions were terminated after three weeks. On remand, the district judge should consider whether each specific restriction amounted to an infliction of pain without penological purpose. In making this evaluation, the district judge should consider the length of time each restriction was in effect, and whether the restriction and its duration bore a relationship to legitimate attempts to ease the emergency. The district court's conclusion that the loss of control of the prison is a violation of the inmates' rights is erroneous. Whether the state of affairs at the prison leading up to the lockdown was the fault of the prison officials is irrelevant for the purpose of our analysis of conditions during the lockdown. The prison officials have a right and a duty to take the necessary steps to reestablish order in a prison when such order is lost. This is for the benefit of the prisoners as much as for the benefit of the prison officials.

### J. Access to Court and Retaliation.

▮ The district judge found:

There is some evidence Defendants might have retaliated against a number of Plaintiffs or inmate witnesses for their involvement in this lawsuit. This retaliation has consisted of verbal harassment, threats, and, possibly, transfers to other institutions.

On the basis of this finding, the district judge concluded:

Prisoners have the right to petition the courts for redress of their grievances; harassment, threats, and transfers by prison officials that interfere with or penalize the exercise of that right violate the constitute (sic).

The district court ordered:

Defendants and their agents are hereby enjoined from retaliation against plaintiffs for exercise of their right to access to courts and counsel. Such injunction includes, but is not limited to retaliatory harassment, threats, or transfers.

Defendants shall notify the Special Master and all opposing counsel prior to transferring any penitentiary prisoner out of the State of Washington. If the master determines that the proposed transfer is retaliatory, the transfer shall not be implemented pending this Court's review.

We hold the conclusion is erroneous and reverse the order. The finding of fact is insufficient to amount to a violation. Although we have no quarrel with the district judge's statement of the law, we require more than "*some* evidence" that the State "*might* have retaliated" against the inmates and that this "*possibly*" resulted in transfers. We further observe that this issue was not before the district court. It was not raised in the complaint. The inmates at no time sought to amend their complaint or to file an appropriate motion raising it. Therefore, on the current state of the record, it would be error for the district court to consider this issue on remand.

## III

### Procedural Issues

### A. Appointment of Amicus Curiae.

Shortly after the complaint was filed, the district judge granted the inmates' motion to appoint the United States Department of Justice and the United States Attorney for the Eastern District of Washington as amicus curiae. The order provided that the Department of Justice and the United States Attorney "investigate fully the facts alleged in the complaint, ... participate in the case with the full rights of parties, and ... advise the Court on the public interest(s) at issue."

▮ The district court has broad discretion to appoint amici curiae. We may reverse an order appointing amici only if the district judge has abused his discretion. We are unable to say that the district judge has done so in this case.

▮ It appears that the United States Attorney acted exclusively on behalf of the points of view taken by the inmates. Amicus participated fully in the discovery, trial, and appeal of this case. There is no indication, however, that amicus controlled the litigation, or that the inmates were mere strawmen to confer standing so that amicus could litigate its views. Amicus did, of course, have an interest in vindicating federal constitutional rights. There is no rule, however, that amici must be totally disinterested. The district judge was apparently satisfied that amicus was helpful to it in investigating the facts and advising it on the federal government's position on issues of federal constitutional law.

We conclude that the district judge did not abuse his discretion in appointing the Department of Justice and the United States Attorney as amicus curiae. Although we recognize that participation of the United States in this case was somewhat more than the usual participation of amici, we are unable to say that the degree of amicus's participation was error or in any way prejudiced the rights of the State.

## B. Setting of Trial Date.

■ The State complains that the trial date, set six months after service of the inmates' complaint, failed to allow adequate time for preparation and discovery. The State claims that the trial judge failed to consider the size and complexity of the case and the length of time that it would take the parties to prepare adequately. Given the time limits imposed on various discovery procedures in the Federal Rules of Civil Procedure and the discovery schedule set by the court, the State claims that it had inadequate time to prepare its case for trial.

The State relies on *Freehill v. Lewis*, 355 F.2d 46 (4th Cir. 1966), which we cited with approval in *Transamerica Computer Co. v. International Business Machines Corp.*, 573 F.2d 646, 653 (9th Cir. 1978). In *Freehill*, the Fourth Circuit recognized the general rule that a district court has broad discretion in the supervision of its docket and should take pains to assure the prompt hearing and disposition of cases. The court recognized, however, that:

> The exceptional case requires different treatment ... and the spirit of the rules does not require that completeness in the exposure of the issues in the pretrial discovery proceedings be sacrificed to speed in reaching the ultimate trial on the merits. Delays should be avoided to the extent that it is unnecessary or unreasonable but adequate time must be allowed for discovery of the facts and assembly of proof.
>
> ... [C]onsideration may and must be given to the complexity of the issues and of the proof and of the amount of time reasonably required for the pretrial processes if pursued with reasonable dispatch....

This Court is in no position to determine the extent of the complexity of issues or the time reasonably required for completion of the discovery processes if reasonably and diligently prosecuted. Such an inquiry is appropriate in a pretrial hearing, for, where counsel for all parties are present in a relatively informal proceeding, a District Judge can readily appraise the problems as they appear to be at that time.

*Freehill v. Lewis, supra*, 355 F.2d at 48. The gravamen of *Freehill* is that the district judge had failed to make any inquiry into the time necessary for preparation. In the case before us, the district court did make such an inquiry, but was unconvinced by the State's estimate of necessary preparation time in light of the State's control over most of the evidence. We agree with the Fourth Circuit that we are not in as good a position as the district judge to assess for ourselves the complexity of a case or the time required to complete discovery and prepare adequately for trial. These are matters best determined by the district judge. We cannot say that the district judge abused his discretion in making this determination. *See CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962).

## C. Recusal.

■ The district judge denied the State's motion that he recuse himself. The State raised this motion pursuant to 28 U.S.C. §§ 144, 455. The State claims that the district judge indicated his belief that there were serious problems at the penitentiary, that the courts were the appropriate vehicle for reform in light of legislative and administrative failures, and that the district judge's pretrial rulings in favor of the inmates confirmed his bias.

The district judge did not abuse his discretion in denying the State's motion. Judges do not exist in a vacuum. It could hardly be expected that the district judge be unaware of events at the penitentiary. The killings and lockdown were very recent history when the district judge made these statements. Indeed, the State admitted that there were problems at the prison. Although no difficulty would have arisen had the district judge remained silent about his awareness of certain conditions at the penitentiary, we cannot assume that he considered facts outside the record in making his determinations. The allegations made by the State do not rise to the level of the kind of personal bias or reasonable questioning of the district judge's impartiality

required for a judge to recuse himself. *See generally Laird v. Tatum*, 409 U.S. 824, 93 S.Ct. 7, 34 L.Ed.2d 50 (1972) (memorandum of Justice Rehnquist). In addition, we are unable to say that the pretrial rulings, which we have largely affirmed, were indicative of a bias on the part of the district judge. *See Hagans v. Andrus*, 651 F.2d 622, 628 (9th Cir. 1981).

### D. *Evidence.*

■ The State objects to the district judge's admission and reliance on certain evidence. When, as here, the case is tried to the district judge without a jury, we will not reverse the district judge's rulings on evidentiary matters unless there is a clear abuse of discretion. *Kaplan v. International Alliance of Theatrical & Stage Employees & Motion Picture Machine Operators*, 525 F.2d 1354, 1362 (9th Cir. 1975). The State has failed to show such a clear abuse of discretion in any of the evidentiary matters.

The State first complains about the district judge's reliance on an investigative report prepared by employees of the State Attorney General's office for the Secretary of the Department of Social and Health Services, one of the defendants. The State complains that the district judge failed to consider whether the statements contained in the report were within the scope of the employees' agency. Further, the State complains that the report contained opinions, and the expertise of the declarants had not been established.

■ Federal Rule of Evidence 801(d)(2)(D) makes a statement non-hearsay if it "is offered against a party and is . . . a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship . . . ." Contrary to the State's view, the rule does not require a showing that the statement is within the scope of the declarant's agency. Rather, it need only be shown that the statement be related to a matter within the scope of the agency. *See* Fed.R.Evid. 801, Notes of Advisory Committee on Proposed Rules. Because the report was prepared pursuant to the direction of the Secretary of the Department of Social and Health Services, it was not an abuse of discretion for the district court to conclude that the statements contained in the report were within the scope of the declarant's agency. Further, there is no requirement that the party offering an admission of a party opponent demonstrate the expertise of the party. *See generally id.*[10]

■ The State also claims that this report should not have been admitted because it was covered by the attorney-client privilege and the attorney work-product doctrine. The district judge did not abuse his discretion in admitting the evidence over these objections. The report was written by non-lawyers, was completed in July 1979 prior to the initiation of this lawsuit, was not done with the apparent purpose of preparing for litigation, and was eventually made public. The district judge had a solid basis on which to believe that neither the attorney-client privilege nor the work-product doctrine applied.

■ The State next complains about the admission of two depositions that were not complete. When the depositions were terminated, the inmates and amicus indicated that they had further questions, and the State reserved the right to cross-examination. The depositions were never reconvened. The inmates and amicus introduced the depositions, though they were unsigned and unreviewed by the witnesses. We do not think that the State has satisfied its burden of showing a clear abuse of discretion in the admission of these depositions. Both depositions were terminated by mutual consent, and there was never any firm agreement concerning the completion of them. The State apparently made no attempt to reconvene the depositions when it

---

**10.** Our analysis of Rule 801(d)(2)(D) applies also to testimony of inmates concerning statements made by guards. All the statements concerned matters within the scope of the guards' agency.

appeared that the inmates were not going to. Further, there is no indication that the State was or could have been prejudiced by the admission of the depositions. One of the deponents was a named defendant, the other a prison employee. If there was testimony in the depositions that was damaging to the State, it has not explained why it could not have called the witnesses and examined them, in lieu of cross-examination at the deposition.

The State's final evidentiary point is a conclusory statement that the trial court relied on hearsay used by experts to form opinions for their truth. The State's argument is too vague to satisfy its burden of showing an abuse of discretion.

### E. Attorney's Fees.

■ We vacate the district court's award of attorney's fees pursuant to 42 U.S.C. § 1988. Because we have found error, reversed, vacated, or remanded so many of the district court's conclusions, and so much of its order, we must permit the district judge to reassess, after his new determinations in light of this opinion, whether the inmates are prevailing parties entitled to attorney's fees under section 1988.

### F. Appointment of Special Master.

■ As part of its remedy, the district court appointed a Special Master, pursuant to Fed.R.Civ.P. 53. The State argues that such an order places the court, not the prison officials, in charge of the prison.

Because of the complexity of this litigation and of compliance with the district court's orders, we conclude the district judge did not err in deciding that the requirement that masters be appointed only to exceptional cases had been met. Fed.R. Civ.P. 53(b). An order placing a master in control of the prison would have been error as an overreaching of judicial authority. We read the district court's order of reference, however, to empower the master only to monitor compliance with the court's orders and to approve plans ordered submitted by the court. This was not an abuse of discretion.

In light of our disposition of the district court's conclusions and order, however, there is no present need for a Special Master. We therefore vacate the order of reference. The district judge can reassess the need for a Special Master after the proceedings on remand.

AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED.

TANG, Circuit Judge, concurring:

The majority opinion provides an excellent discussion of the issues and reaches a sensible result. I quarrel, however, with the opinion's discussion of the district court's orders respecting racism, prisoner classification, and guard screening, recruitment and training programs. The opinion blurs the fundamental distinction between rights and remedies and, in so doing, improperly restricts the scope of the federal judiciary's power to remedy constitutional violations.

The majority opinion concludes that the district court's orders affecting these three areas were based either on an erroneous ruling that these mandated programs were required per se by the Eighth Amendment or on the use of the "totality of conditions" test discredited in Wright v. Rushen, 642 F.2d 1129 (9th Cir. 1980). See ante Majority Opinion at 1249 (guard programs), 1251–52 (racism), 1255–56 (classification). I am not convinced that these were necessarily the only bases for the district court's action.

The district court's opinion is not a model of clarity. I agree with the majority that the district court erred in Conclusion of Law 33 in relying upon the "totality of conditions" standard to justify these three sets of orders. It is a mistake, however, to linger too long over this single conclusion of law. At least with respect to prison violence, the "totality of conditions" ruling was only an alternate basis for the district court's holding. The district court also

ruled that "[c]onfinement at Washington State Penitentiary where inmates are exposed to a high level of violence and, therefore, experience justifiable fear of assault, is *itself* an Eighth Amendment violation." Conclusion of Law 17 (emphasis added).

It is apparent from the structure and content of the district court's opinion that the court's rulings on guard misbehavior, prisoner classification, and racism were prompted partly by the court's legal conclusion that the level of violence at the prison was unconstitutional. Following immediately after the court's ruling on prison violence, the court linked the existence of prison violence to the need for guard recruitment, screening, and training programs:

> In meeting their constitutional duty reasonably to protect inmates from harm, Defendants have an obligation to assure quality of correctional staff. Measures to assure a quality staff include the development of job recruitment standards, the use of psychological testing in hiring, and appropriate pre-service and in-service training.

Conclusion of Law 18 (emphasis added).

Read in context with Conclusion of Law 17, Conclusion of Law 18 appears to say that guard recruitment, screening, and training programs are essential to abating unconstitutional levels of prison violence. The first clause in the first line of Conclusion of Law 17 makes clear, at least from my reading, that the obligations to institute guard programs is contingent upon a legal conclusion that prison authorities have not discharged their obligation to protect inmates from harm. Conclusion of Law 18 thus appears to derive from Conclusion of Law 17, and appears to stand apart from Conclusion of Law 33.

Although the trail is not so well marked, the district court's remedial order directing prison authorities to institute programs to combat racism also appears based on Con-

clusion of Law 17. The district court's fact findings pertaining to racism focused exclusively upon racism's effect on the level of violence condemned in Conclusion of Law 17. The court found:

—Racism "permeates the administrative policies and practices at WSP" and "has contributed to an atmosphere of *fear, hatred, and violence* at the Penitentiary." Finding of Fact 60 (emphasis added).

—"The administration has *exacerbated racial tensions* between minority prisoner groups and has increased minority prisoners' suspicion and distrust of the administration and guards." Finding of Fact 61 (emphasis added).

—The prison authorities' "[f]ailure to sensitize administration and staff [to the problem of race dynamics] *affirmatively contributes to the level of tension, frustration, and violence* within the Penitentiary." Finding of Fact 62 (emphasis added).

—"A number of the *violent incidents* at WSP, including the killings of 2 prisoners, *appear to have been racially motivated*." Finding of Fact 63 (emphasis added).

These findings' exclusive concern is that racism at Washington State Penitentiary substantially contributes to the level of violence at the prison. Conclusion of Law 17 states that this level of violence is constitutionally intolerable. The only conclusion I can draw from these two premises is that the district court ordered programs to alleviate racism partly because the court believed that this relief was deemed necessary to alleviate the constitutional violation condemned in Conclusion of Law 17.[1]

The basis for the district court's order regarding prisoner classification is admittedly not as clear as the basis for its orders on racism or guard programs. Conclusion

---

1. The majority opinion also holds that the district court erred in ruling on racism because it was not raised in the plaintiff's complaint. *See ante* Majority Opinion at 1251. This holding misconceives the district court's action. The court issued its order respecting racism as part of its relief for the claim based on the state's failure to take reasonable steps to ensure prisoner safety. This claim was raised in the plaintiff's complaint and was therefore properly before the district court.

of Law 24 states that the "[a]bsence of a reception or orientation process and lack of a comprehensive coordinated classification system contribute so substantially to the potential for violence and so impede rehabilitation as to constitute part of the Eighth Amendment violations existing at the Penitentiary." Conclusion of Law 24.

The majority opinion interprets this Conclusion of Law to mean "that the district court considered the classification system as part of the 'totality of conditions' that amounted to the Eighth Amendment violations at the penitentiary." *See ante* Majority Opinion at 1255. This interpretation is not necessarily an unfair reading of Conclusion of Law 24, but it overlooks the district court's choice of language elsewhere in its Conclusions of Law. When the district court chose to employ the "totality of conditions" approach, it was careful to employ the phrase or to restate the rule the phrase embodies. *See* Conclusions of Law 13 (restating "totality of conditions" rule); 28 ("totality of conditions" within Intensive Security Unit); 32 (the "general condition of the penitentiary's physical facilities when considered in their totality"); 33 (entitled "Unconstitutionality of Totality of Conditions").

The language employed in Conclusion of Law 24 instead appears to be closer to the language used in Conclusion of Law 5, which states, "[w]hen the evidence demonstrates a violation of an inmate's constitutional rights, the equitable power of a District Court is such that injunctive relief may properly '[A]ddress each element contributing to the violation.' " Conclusion of Law 5 (quoting *Hutto v. Finney*, 437 U.S. 678, 685, 98 S.Ct. 2565, 2570, 57 L.Ed.2d 522 (1976)). Conclusion of Law 24 therefore does not appear to be saying that prisoner misclassification is itself unconstitutional, but that its contribution to prison violence renders it inextricably linked with the prison's failure to protect its prisoners and with what the district court ruled was the prison's obligation to provide rehabilitation programs. Although the district court's reliance upon a right to rehabilitation is probably misplaced, prisoner classification appears sufficiently related to the prison's obligation to protect its prisoners that it is a component part of the violation identified in Conclusion of Law 17.

For the reasons stated above, my reading of the district court opinion persuades me that the district court's orders affecting guard programs, racism, and prisoner classification were prompted by the court's perception that they were necessary to alleviate the constitutional violation arising from prison violence.

If my perception of the district court decision is correct, then the majority uses the incorrect standard of review in evaluating the district court's actions affecting these areas. Rather than inquiring, as the opinion does, whether the mandated programs were required *per se* under the Eighth Amendment, the proper inquiry is whether the district court abused its remedial power in ordering these programs to vindicate the prisoners' Eighth Amendment right to be protected from harm.

It is clear that a district court possesses broad constitutional power to create remedies to alleviate constitutional violations. This power is sufficiently broad to permit the district court to order programs to alleviate conditions contributing to the existence of the constitutional violation even when those conditions do not by themselves constitute Eighth Amendment violations. *See Hutto v. Finney*, 437 U.S. 678, 687 n.9, 98 S.Ct. 2565, 2572 n.9, 57 L.Ed.2d 522 (1978); *Milliken v. Bradley*, 433 U.S. 267, 281–283, 97 S.Ct. 2749, 2757–2759, 53 L.Ed.2d 745 (1977).

Applying these standards here, the district court found that guard misbehavior, racism, and prisoner misclassification were principal causes of violence at the prison. The majority opinion does not appear to dispute these findings, and the evidence cited in the district court's findings of fact appear to support their validity. The district court therefore had the constitutional power to tailor its remedy to alleviate guard misbehavior, racism and prisoner misclassification.

For instance, the district court found, and the majority opinion apparently agrees, that racial tension was a principal cause of the prison violence that gave rise to the Eighth Amendment violation occurring here. *See* Findings of Fact 60–63. The court's order respecting racism appears to have been designed to reduce the influence of this cause. It is no answer to say that the absence of programs to combat racism does not violate the Eighth Amendment. So long as racial tension was correctly found to have generated the constitutional violation held here to exist, the district court possessed the constitutional power to issue a remedial order designed to alleviate this cause. The protection the Constitution confers is otherwise worthless.

Nor does *Wright v. Rushen*, 642 F.2d 1129 (9th Cir. 1981), mandate otherwise. *Wright* holds merely that where no single prison condition violates the Eighth Amendment, a court may not hold that the cumulative effect of several prison conditions violates the Eighth Amendment. *Id.* at 1133. This is not the case here. The district court held that the failure of prison authorities to curb violence constituted cruel and unusual punishment. Once this holding is established, nothing in *Wright* limits a court's constitutional power to alleviate conditions that are instrumental in causing the violation to occur.

Despite my disagreement with the majority opinion's reasoning, I nonetheless agree that the district court erred in mandating programs affecting guard behavior, racism and prison classification. Although the district court had the constitutional power to act, federal judicial action is also constrained by equitable limitations. In shaping orders affecting state or local governments, courts must consider three factors: (1) the remedy must be related to the condition that violates the Constitution; (2) the remedy must be designed as nearly as possible to restore the victims of unconstitutional conduct to the position they would have occupied in the absence of such conduct; and (3) the remedy must take into account the interests of state and local authorities in managing their own affairs and the con-

stitutional importance of these entities in our federal system. *See Milliken v. Bradley*, 433 U.S. at 280–81, 97 S.Ct. at 2757–2758.

The third factor is particularly relevant here. State and local authorities have primary responsibility for curing constitutional violations in prisons. If these authorities, however, prove recalcitrant in curing these violations once enjoined to do so, a comprehensive and specific remedy directed at the causes of the violation is appropriate. *See Hutto v. Finney*, 437 U.S. at 687, 98 S.Ct. at 2571. There is no evidence here, however, to suggest that the State has failed to comply with any of the district court's orders or would not adopt effective programs to assure prisoner safety if given a general order to do so. Given the importance of respecting the integrity and competence of state institutions, the relief awarded here should have been limited to a general mandate to reduce prison violence.

Although the majority opinion's ultimate result appears correct, the result should be grounded on the holding that the district court exceeded its equitable power in shaping a remedy and not upon a holding that the court had no constitutional authority to provide a remedy. If the State later proves intransigent in taking reasonable steps to assure prisoner safety, the district court should be permitted to enforce its general order by mandating specific reform measures. The majority opinion, by limiting the district court's constitutional power to issuing a general order to curb violence, unduly hobbles the district court's ability to enforce its order if State intransigence occurs.