Charles L. ARNOLD, Guardian ad litem on Behalf of H.B.; Plaintiff,

v.

Samuel LEWIS, et al., Defendants.

Nos. CIV 90–0054 PHX CAM, CIV 91–1808 PHX CAM.

United States District Court, D. Arizona.

Sept. 3, 1992.

Tannis L. Fox, Arizona Center for Law in the Public Interest, Phoenix, Ariz., for plaintiff.

Sonia Overholser, Asst. Atty. Gen., Phoenix, Ariz., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MUECKE, District Judge.

Having considered all of the documents relevant to the plaintiff's motion for perma-

nent injunction and all of the evidence presented to the Court in the week-long hearing, the Court concludes as follows:

## FINDINGS OF FACT

### A. PROCEDURAL HISTORY

Plaintiff, Charles L. Arnold, as guardian ad litem for H.B., filed this action on November 14, 1991 on behalf of H.B. and others similarly situated. Defendants are Samuel Lewis, director of the Arizona Department of Corrections (DOC); Mary Vermeer, deputy warden of the Santa Maria Unit at the Perryville Prison; and David Fernandez, M.D., a psychiatrist employed by the DOC. Plaintiff filed this action pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201 and 2202 seeking (1) a declaration that defendants violated her eighth and fourteenth amendment rights by their deliberate indifference to her mental health needs and (2) an injunction enjoining defendants from transferring her from the Flamenco unit, a DOC mental health facility, and from illegally placing her in lock down because of her mental illness.

This court issued two temporary restraining orders prohibiting the transfer of H.B. from the Flamenco unit to the Santa Maria Unit at Perryville. On November 16, 1991, the parties agreed to a preliminary injunction enjoining the transfer of H.B. from Flamenco pending a ruling from the Court on this motion for permanent injunction.

### B. THE PARTIES

Plaintiff H.B. is a fifty-three year old, black female inmate at the DOC. PTSF 1.[1] Plaintiff has been incarcerated in the Santa Maria Unit at Perryville Prison since 1981, when she was convicted of aggravated assault. PTSF 3.

Defendant Lewis is the director of the DOC. As such, he is responsible for ensuring the medical care of DOC inmates, including mental health treatment. A.R.S. § 31–201.01.D. Pursuant to A.R.S. § 31–226.A, defendant Lewis must file a petition to transfer a female inmate to the Arizona State Hospital (ASH) upon submission of a written report by the DOC psychiatrist that an inmate needs transfer to "ensure adequate treatment." If the report states that the inmate is a danger to self or others, the defendant Lewis must immediately authorize the transfer.

Defendant Vermeer is the deputy warden of the Santa Maria Unit at Perryville Prison. R.T. of December 11, 1991 at p. 5. She is responsible for authorizing placement of inmates in lock-down and for ensuring that inmates receive access to medical care. R.T. of December 11, 1991 at p. 6, 110.

Dr. Fernandez is a psychiatrist employed by the DOC. He treated the plaintiff from October of 1983 to August of 1988 and from May 1989 to April of 1990. R.T. of December 11, 1991 at p. 157, 159; Exhibit 72. Dr. Fernandez supervises and consults with plaintiff's present DOC treating psychiatrist, Dr. Victor Pera. R.T. of December 11, 1991 at p. 155. Dr. Fernandez has the ultimate authority to recommend transfer to the ASH pursuant to A.R.S. §§ 31–226.A and 31–226.01.A. R.T. of December 9, 1991 at p. 164; R.T. of December 11, 1991 p. 198; R.T. of December 13, 1991 at p. 70.

### C. THE FACILITIES

The Santa Maria unit at Perryville is a 312 bed maximum security unit for females. R.T. of December 11, 1991 at p. 18–19. There is a special management area with forty-eight lock down cells. R.T. of December 11, 1991 at p. 18, 150. Flamenco is a new DOC mental health facility located on the state hospital grounds. One ward is available for women. R.T. of December 11, 1991 at p. 154, 196.

### D. THE PLAINTIFF'S MEDICAL NEEDS AND THE DEFENDANTS' TREATMENT OF THOSE NEEDS

1. Plaintiff has medical needs due to her severe mental illness.

Plaintiff has a severe mental illness. Specifically, she has been diagnosed as hav-

---

**1.** PTSF refers to undisputed facts stipulated to by the parties in the pretrial statement.

ing schizophrenia, chronic, paranoid type. PTSF 2. Plaintiff H.B.'s mental illness presents a serious medical need. PTSF 6. Plaintiff has been treated for schizophrenia since 1955. From 1973 through 1991, plaintiff was admitted to the Arizona State Hospital (ASH) fourteen times, nine of those occasions admitted upon the transfer from the DOC. Exhibit D. Plaintiff's schizophrenia causes her to have delusions and hallucinations and impairs her judgment so that she is not competent to make decisions regarding her care and treatment. R.T. of December 9, 1991 at p. 11, 185, 191, 210. Plaintiff requires antipsychotic medication to treat her schizophrenia. R.T. of December 9, 1991 at p. 6. Plaintiff should be confined in a hospital-like residential treatment facility, like the Flamenco unit, so that medication may be administered against her will if she stops taking her medication and her condition deteriorates. R.T. of November 25, 1991 at p. 156. The plaintiff's mental health needs cannot be met in DOC general population or in lock down. R.T. of December 9, 1991 at p. 25–27; R.T. of December 13, 1991 at p. 184; R.T. of November 25, 1991 at p. 60.

2. The defendants have neglected to treat plaintiff's mental illness.

The DOC has seriously neglected plaintiff's mental health care needs during her ten years of incarceration. R.T. of November 25, 1991 at p. 150; R.T. of December 9, 1991 at p. 27. During this time-period, the DOC's treatment of plaintiff has followed a distinct pattern of confinement in lock down for prolonged periods of time with denial of mental health treatment during lock down. R.T. of November 25, 1991 at p. 148–149; Exhibit D. As a result of the denial of mental health treatment, plaintiff's condition deteriorates and she is eventually transferred to the Flamenco unit or ASH. R.T. of November 25, 1991 at p. 148–149; Exhibit D. She is released again to general population where she is again locked down. R.T. of November 25, 1991 at p. 148–149; Exhibit D. In some cases, plaintiff was locked down within twenty-four to seventy-two hours after transfer from ASH back to DOC. R.T. of December 9, 1991 at p. 34.

*a. Defendants have placed plaintiff in lock down to punish her for her hostile, threatening behavior that is the result of her mental illness.*

Plaintiff is placed in lock down because of behavior resulting from her mental illness, schizophrenia. R.T. of November 25, 1991 at p. 58, 129–103, 151–152; R.T. of December 9, 1991 at p. 13–20. Exhibits 20, 27, 28, 35, 37, 38, 39, 44, and 49. Specifically, when plaintiff does not receive or take her medication, she can become hostile and threatening. R.T. of November 25, 1991 at p. 150, 156; R.T. of December 9, 1991 at p. 6. When plaintiff is taking her medication and receiving appropriate treatment, she is not hostile or threatening. R.T. of December 9, 1991 at p. 9; R.T. of December 13, 1991 at p. 112, 181–182; R.T. of December 11, 1991 at p. 170. The behavior for which plaintiff is locked down does not result from a personality disorder. R.T. of December 13, 1991 at p. 166–171, 181–182; R.T. of December 9, 1991 at 184; Exhibit I. DOC psychiatrists did not authorize placing plaintiff into or releasing her from lock down. R.T. of December 11, 1991 at p. 185; Exhibits 72–77.

Plaintiff has a significant history of being locked down during her incarceration at DOC. From May 12, 1989 to October 2, 1991, when the state court enjoined plaintiff's transfer from ASH to the DOC, plaintiff was in lock down 514 days [approximately 60% of her total time in DOC custody]. Exhibits D and E. During that same period of time, she was in ASH or Flamenco 278 days [32.5% of her total time in DOC custody]. *Id.* Also during the same period, she was in general population 64 days [7.5% of her total time in DOC custody]. *Id.* Because of a lack of records, the extent of lock down prior to May 12, 1989 is not completely known. Exhibits D and E. While plaintiff was in lock down, she deteriorated to the point that constitutes a psychiatric emergency. R.T. of December 9, 1991 at p. 16. In most cases, plaintiff should have been taken out of lock down

based on medical necessity. R.T. of November 25, 1991 at p. 169.

Plaintiff was placed in lock down on May 12, 1989 and remained in lock down for eleven and one-half months. *Id.* During that period of time, medical records document nine visits by a psychiatrist on May 18, May 23, June 15, July 13, August 18, October 23, November 27, December 29, 1989, March 5, and April 23, 1990. Exhibits D, 72. There is no documentation in the medical records of any visits by a psychiatrist from December 29, 1989 until April 23, 1990, four days prior to her voluntary transfer to Flamenco. *Id.* During this period of time, defendant Fernandez was plaintiff's treating psychiatrist. R.T. of December 11, 1991 at p. 157; Exhibit 72.

Plaintiff was discharged to the Santa Maria unit on October 24, 1990. Exhibit D. She was placed in lock down on the following day, October 25, 1990. Exhibits D and E. On November 21, 1990, less than one month later, plaintiff was again placed in lock down. *Id.* Plaintiff remained in lock down for five weeks until December 26, 1990. *Id.* During that five-week period, she was seen by a psychiatrist three times. Exhibit D.

Plaintiff was released from lock down on December 26, 1990, but returned to lock down five days later, on December 31, 1990. Exhibits D and E. After approximately two weeks, she was transferred to ASH. *Id.* During that period of time, she saw a psychiatrist one time. *Id.* Plaintiff remained in ASH from January 11, 1991 to February 15, 1991, when she was transferred back to the Santa Maria unit. Exhibit D. Three days later, on February 18, 1991, plaintiff was again placed in lock down and remained there for six weeks, until March 28, 1991. Exhibits D and E. During this period, she was seen by a psychiatrist one time. Exhibit D.

Approximately one month after her release from lock down, on May 3, 1991, plaintiff was again locked down. Exhibits D and E. This time, plaintiff was locked down for eleven weeks, until July 18, 1991. *Id.* She was released from lock down July 18, 1991 but again locked down one week

later on July 26, 1991. *Id.* On August 1, 1991, plaintiff was transferred to ASH and she remained in that facility until November 14, 1991. Exhibit D. During this three and one half month admission at ASH, plaintiff was not placed in seclusion, isolation or restraints of any kind. PTSF 6.

While she is locked down in DOC custody and because of her mental illness, plaintiff frequently refuses to shower. R.T. of December 9, 1991 at p. 7; Exhibit E. For example, during a seven-week period from May 28, 1991 through July 18, 1991, plaintiff took one shower. Exhibit E. Neither DOC security nor psychiatric staff takes sufficient action to see that plaintiff showers or meets her personal hygiene needs. R.T. of December 9, 1991 at p. 7.

*b. The defendants have failed to provide psychiatric follow-up for plaintiff while she has been locked down.*

The defendants have not provided the psychiatric follow-up that plaintiff should have received while she was in lock down. R.T. of November 25, 1991 at p. 151; R.T. of December 9, 1991 at p. 14–15. There have been repeated occasions when plaintiff's treatment has been delayed because a psychiatrist did not see plaintiff when necessary or when she should have been transferred to a mental health facility but was not transferred. R.T. of November 25, 1991 at p. 149, 151.

Upon placement in lock down, plaintiff should have received almost immediate psychiatric follow-up. R.T. of November 25, 1991 at p. 155; R.T. of December 9, 1991 at p. 16–17. However, when the defendants placed plaintiff in lock down she was never seen by a psychiatrist immediately. R.T. of November 25, 1991 at p. 155, 167; Exhibit D; R.T. of December 13, 1991 at p. 42.

When plaintiff was locked down, she should have been seen daily by a psychiatrist; however, she was not seen daily. R.T. of November 25, 1991 at p. 52, 167; R.T. of December 9, 1991 at p. 5, 8–9; Exhibit D. When plaintiff was in lock down for eleven and one half months, she was seen by a psychiatrist nine or ten times. Dr. Garcia commented that this rec-

ord was "dismal." R.T. of November 25, 1991 at p. 149, 153; R.T. of December 9, 1991 at p. 5, 13, 19. During the 514 days that plaintiff was in lock down, she was seen by a psychiatrist twenty or twenty-one times. Exhibits D and E. During the long periods in lock down, plaintiff was seen by a psychiatrist with decreasing frequency instead of increasing frequency as would be expected. R.T. of November 25, 1991 at p. 153.

When she was locked down, plaintiff should also have been seen regularly each day by other trained mental health professionals. R.T. of November 25, 1991 at p. 52, 222; R.T. of December 9, 1991 at p. 8. While locked down, no other trained mental health professionals evaluated plaintiff. R.T. of December 11, 1991 at p. 62, 86. During lock down, plaintiff was checked daily by a nurse, as all inmates in lock down are checked daily by a nurse. R.T. of December 11, 1991 at p. 86; Exhibits 72–77. Dr. Garcia concluded that this "is not treatment at all." R.T. of November 25, 1991 at p. 155.

### c. The defendants have failed to monitor plaintiff's medication.

The DOC has failed to monitor plaintiff's medication. Plaintiff occasionally refuses to take her prescribed medication. R.T. of November 25, 1991 at p. 156, 163. When plaintiff has failed to take her medication, DOC psychiatric staff has not taken action to ensure that she take the medication or transferred her to ASH where she could be forcibly medicated. R.T. of November 25, 1991 at p. 59, R.T. of December 9, 1991 at p. 5–6. Specifically, on January 3, 1990, seven months into the eleven and a half month lock down, security staff reported that plaintiff was combative, aggressive, and refused to take her medication, as she had done for at least the past two weeks. Exhibit 32. A medical evaluation was requested and the incident report sent to Dr. Fernandez. Exhibit 32. Dr. Fernandez failed to respond. Exhibit D. The next visit documented in the medical records by a psychiatrist is three and one half months later on April 23, 1990 by defendant Fer-

nandez. Exhibits D, 72. Plaintiff was voluntarily transferred to Flamenco four days later. Exhibit D. In another instance on May 28, 1991, Dr. Pera documented in the medical record that plaintiff was noncompliant with her medication. However, she was not transferred to ASH, where she could be forcibly medicated, for another two months. Exhibits H, D, and 74.

On another occasion, DOC psychiatrists allowed plaintiff's medication to lapse for ninety days. R.T. of December 9, 1991 at p. 6. Such a lapse would worsen plaintiff's condition. R.T. of December 9, 1991 at p. 6.

### d. The defendants have failed to transfer plaintiff to ASH when necessary to ensure adequate treatment.

On numerous occasions, plaintiff should have been transferred to ASH as necessary to ensure adequate treatment, but was not. R.T. of November 25, 1991 at p. 163; R.T. of December 9, 1991 at p. 19, 23–24. Rather, the DOC has used lock down as an alternative to providing plaintiff with necessary mental health treatment. R.T. of December 9, 1991 at p. 26.

Also, on numerous occasions a DOC psychiatrist recommended transfer of plaintiff to ASH but the transfer was delayed or did not occur. R.T. of December 9, 1991 at p. 24–25; R.T. of December 11, 1991 at p. 266, 272, 274–275. DOC medical records do not document why plaintiff was not transferred to ASH when recommendations were made. R.T. of December 9, 1991 at p. 24; R.T. of December 11, 1991 at p. 266, 272, 274–275; Exhibit H. Delay after a recommendation that an inmate be transferred to ASH does not conform to medical standards. R.T. of December 13, 1991 at p. 61. Emergency transfers pursuant to A.R.S. § 31–226.01 should and can take one day. R.T. of December 11, 1991 at p. 174, 257.

On March 1, 1988, defendant Fernandez documented in plaintiff's medical record that "patient has been kept in lock down because of being irritable and having no insight into her condition." R.T. of Decem-

ber 11, 1991 at p. 26; Exhibit H. He also stated that "patient needs to be admitted to psychiatric facility to control current symptoms." R.T. of November 11, 1991 at p. 267; Exhibit H. Plaintiff was not transferred to ASH until April 12, 1988, six weeks later. R.T. of December 11, 1991 at p. 268; Exhibit D. Plaintiff was locked down during part of that time. R.T. of December 11, 1991 at p. 268; Exhibits D and E.

On October 19, 1988, a DOC psychiatrist documented that plaintiff "continues to hear voices and reports paranoia" and "has active auditory hallucinations and delusions." R.T. of December 11, 1991 at p. 269; Exhibit H. Further, plaintiff reported "that she wants to go to the State Hospital and that she wants and needs to get out of lock down. I agreed that [patient] could request to go to the A.S.H." Exhibit H. Plaintiff was not transferred to ASH. R.T. of December 11, 1991 at p. 269; Exhibit D.

On March 8, 1989, a DOC psychiatrist documented that plaintiff had "paranoia and grandiose delusions" and that her "insight into illness [was] very limited to severely impaired." R.T. of December 11, 1991 at p. 270; Exhibit H. The psychiatrist noted that plaintiff would be transferred involuntarily to ASH. R.T. of December 11, 1991 at p. 270; Exhibit H. Plaintiff was not transferred. R.T. of December 11, 1991 at p. 270; Exhibit H. Two months later, plaintiff was placed in lock down where she remained for eleven and a half months. R.T. of December 11, 1991 at p. 270; Exhibit D.

On December 14, 1990, Harold Burton, a DOC social worker, wrote a memorandum to the director of health services, Dr. Thomas Lutz, requesting the "immediate" emergency transfer to ASH for plaintiff. Exhibit 65. The memorandum stated that plaintiff was in lock down, refusing psychiatric treatment and medication and was in "constant agitation, coupled with active hallucinations and delusions." Exhibit 65. The memorandum further stated that plaintiff required staff assistance with maintaining her daily living activities and proper nutrition and that she "is now suffering

and will continue to sustain further physical and psychological/emotional harm unless immediate action is not [sic] forthcoming to admit and treat her on an involuntary emergency basis at the Arizona State Hospital per Arizona Revised Statutes § 31–226.01." *Id.*

Four days later, Dr. Pera documented in the medical record that plaintiff was noncompliant with her medication and the plan of treatment was that she be committed to State Hospital. Exhibit H. On that date, Dr. Pera submitted an affidavit stating that plaintiff required emergency transfer to ASH. Exhibit 65. Plaintiff was not transferred until nearly a month after Mr. Burton's memorandum and she remained in lock down for all but five days of that month. Exhibit D.

On May 28, 1991, Dr. Pera documented that plaintiff was not taking her medication and should be transferred to ASH. Exhibit H; R.T. of December 11, 1991 at p. 271. On June 4, 1991, Dr. Pera documented that plaintiff "has decompensated" and was not taking her medication. R.T. of December 11, 1991 at p. 271. On June 5, 1991, Mr. Burton again wrote a memorandum to the director of health services requesting immediate emergency transfer of plaintiff to ASH. R.T. of December 11, 1991 at p. 275; Exhibit H. Mr. Burton stated that plaintiff was in lock down, refusing to take medication, deteriorating and psychotic. R.T. of December 11, 1991 at p. 275; Exhibit H. Mr. Burton stated that plaintiff "is now suffering and will continue to sustain further physical and psychological harm unless an immediate transfer to an impatient [sic] mental health treatment facility Arizona State Hospital (ASH) is forthcoming to ensure adequate treatment for her malaise." R.T. of December 11, 1991 at p. 275; Exhibit H. On the same day, Dr. Pera submitted an affidavit stating that plaintiff required emergency transfer to ASH as a danger to herself or others. R.T. of December 11, 1991 at p. 272; Exhibit H. Plaintiff was not transferred until August 1, 1991, two months later. R.T. of December 11, 1991 at p. 274; Exhibit D. During those two months, plaintiff was in lock

down most of the time. R.T. of December 11, 1991 at p. 275; Exhibit D.

### e. When defendants finally transfer plaintiff to ASH where she can receive adequate treatment, plaintiff responds favorably to the treatment.

When the DOC transfers plaintiff to ASH, she responds to treatment. When plaintiff arrives at ASH from DOC her condition has deteriorated. R.T. of December 9, 1991 at p. 185. While treated at ASH, her condition stabilizes and improves. R.T. of December 9, 1991 at p. 186, 189. She takes her medication voluntarily. R.T. of December 9, 1991 at p. 187, 189. Plaintiff is "pleasant" and "cooperative" and her paranoia is significantly reduced, although she is still delusional. R.T. of December 9, 1991 at p. 29, 190–191. During her last three and a half month stay at ASH prior to the hearing in this case, plaintiff was not placed in seclusion, lock down or restraints. PTSF 9. During her hospital stay there were no incidents of assaultive behavior. R.T. of December 9, 1991 at p. 194–195, 207. When plaintiff is being treated appropriately, any need for isolation or lock down is minimal or nonexistent. R.T. of December 9, 1991 at p. 9.

### 3. The mental health care system at Santa Maria is inadequate to meet plaintiff's serious medical needs.

The Santa Maria unit lacks sufficient staff so that plaintiff can be seen by a psychiatrist as often as necessary. R.T. of December 9, 1991 at p. 9. There is one full-time psychologist on staff; a psychiatrist visits inmates once a week and no other trained mental health officials work at the Santa Maria unit. R.T. of November 25, 1991 at p. 52. This number of staff is grossly inadequate to meet the mental health needs of the women incarcerated in Santa Maria, especially those women who are in the special management or lock down cells. R.T. of November 25, 1991 at p. 49–52; R.T. of December 9, 1991 at p. 36; R.T. of December 13, 1991 at p. 113–115. Exhibit A at p. 64–67, 127.

The Santa Maria unit lacks an adequate system to identify and evaluate persons with mental illness. Upon admission, there is no intake procedure to identify inmates with mental illness. Nor does the DOC obtain past psychiatric records of inmates. R.T. of November 25, 1991 at p. 48–50.

The Santa Maria unit lacks an adequate psychiatric referral system so that inmates with mental health problems can be referred to psychiatric staff. R.T. of November 25, 1991 at p. 49, 52; R.T. of December 9, 1991 at p. 130–131. Security staff may file incident reports with defendant Vermeer for bizarre behavior they witness. The reports may be forwarded to psychiatric staff. R.T. of December 11, 1991 at p. 30–31, 114. The Santa Maria unit does not keep track of when incident reports that are forwarded are received by psychiatrists or how long it takes a psychiatrist to respond once an incident report is forwarded. R.T. of December 11, 1991 at p. 33–34.

While plaintiff was in lock down, DOC security staff occasionally filed incident reports with defendant Vermeer that described plaintiff's behavior. Exhibits 21–52, 78. These reports were the only written "referrals" to psychiatric staff from security staff when plaintiff exhibited bizarre behavior. R.T. of December 11, 1991 at p. 30; Exhibit 78. The incident reports were not always forwarded to the psychiatrists by defendant Vermeer. Specifically Exhibits 34, 36, 37, 38, 43, 45, 46 and 48 were not forwarded by Defendant Vermeer to psychiatric staff. R.T. of December 11, 1991 at p. 115. Moreover, Exhibits 36, 37, 38, 43, 45, 46 and 48 indicated that plaintiff was having psychiatric problems. When the incident reports were sent to psychiatric staff, DOC psychiatrists did not respond at all, even when the behavior reported indicated obvious psychiatric deterioration. R.T. of December 9, 1991 at p. 23, 39, 130; Exhibits 26, 27, 28, 29, 30, 32, 33, 35, 41, 42, 44, 47, 49, 50 and D. During lock down, plaintiff was hallucinating. Exhibit 26. Such hallucinations would have seemed real and terrifying to plaintiff. R.T. of December 9, 1991 at p. 12–13, 17. Yet, no DOC psychiatrist responded. Exhibit D.

. The DOC does not have a system to ensure that patients take medication. DOC has the authority to administer medication involuntarily, if medically necessary, but cannot presently do so because defendant Lewis has not promulgated the necessary regulations. *See Large v. Superior Court,* 148 Ariz. 229, 239, 714 P.2d 399, 409 (1986). DOC does not administer medication involuntarily. R.T. of December 11, 1991 at p. 199–200; R.T. of December 13, 1991 at p. 135–136; Exhibit A at p. 100, 120, 147. Nor does DOC promptly treat an inmate that refuses to take medication as it can take two to three weeks before an inmate who refuses medication is seen. R.T. of November 25, 1991 at p. 47, 55–56. During that period of time, a mentally ill inmate could be grossly psychotic or deteriorated. *Id.* An inmate who fails to take prescribed medication should be placed in a psychiatric facility for observation and if the mentally ill inmates is decompensating psychiatrically, that inmate should be transferred to ASH. R.T. of November 25, 1991 at p. 57; R.T. of December 9, 1991 at p. 6. In some cases, it may be necessary to administer medication involuntarily. R.T. of November 25, 1991 at p. 57; R.T. of December 9, 1991 at p. 3.

. There is no effective communication between DOC security staff and DOC mental health staff about the needs of mentally ill prisoners at Santa Maria. R.T. of November 25, 1991 at p. 53, 54, and 59.

Non-medical staff can override medical decisions of psychiatric staff at Santa Maria and Flamenco. R.T. of November 25, 1991 at p. 53, 129, 169; R.T. of December 9, 1991 at p. 37–38; R.T. of December 11, 1991 at p. 101. Both Dr. Fernandez and Pera testified that their recommendations to take mentally ill inmates out of lock down were not followed at either Santa Maria or Flamenco because security staff carried out and could override the recommendation. Exhibit A. at 118; R.T. of November 25, 1991 at p. 53.

Lock down or "the hole" at Santa Maria is a small 7' by 12' cell. R.T. of December 11, 1991 at p. 148. Inmates are confined to these cells twenty-four hours a day and allowed three fifteen minute showers and three one hour periods of exercise per week. R.T. of December 9, 1991 at p. 11–15; Exhibit A. at 8; Exhibit E. Female, mentally ill inmates are placed in lock down for prolonged periods of time as an alternative to providing adequate mental health treatment. R.T. of November 25, 1991 at p. 49, 71–72. These mentally ill women are placed in lock down for periods of up to six months at a time. R.T. of November 25, 1991 at p. 49. At any one time, there are seven or eight mentally ill women locked down in Santa Maria. Exhibit A at 67–68. Lock down generally worsens symptoms of mental illness and can be a "traumatic experience" for the mentally ill inmate. R.T. of December 9, 1991 at p. 17, 26; PTSF 11; Exhibit A at p. 41, 153.

Lock down for mentally ill behavior is only appropriate as a last resort if the individual is a danger to self or others and there are no other effective alternatives. R.T. of November 25, 1991 at p. 220–222; R.T. of December 9, 1991 at 26–27. An individual placed in such lock down, should be evaluated by a psychiatrist immediately. R.T. of November 25, 1991 at p. 221. Lock down is not a treatment for schizophrenia and prolonged lock down is "inexcusable in the management of schizophrenia." R.T. of December 13, 1991 at p. 184.

The DOC has no written rules, policies or procedures to govern (1) screening, identifying and evaluating persons with mental illness or obtaining past psychiatric records of inmates; (2) referral by security staff to psychiatric problems; (3) transfer of inmates from Santa Maria to ASH or Flamenco pursuant to A.R.S. §§ 31–226 or 31–226.01; (4) circumstances under which an inmate with mental illness can be locked down; and (5) psychiatric follow-up of inmates locked down mentally ill inmates. *See* Exhibits 79–86.

4. Plaintiff has been harmed by the defendants' failure to treat her mental illness.

Plaintiff has been and will be harmed in the future if her mental health treatment remains the same. Prolonged lock down

cannot provide the therapeutic setting needed by plaintiff. R.T. of December 9, 1991 at p. 27. Lock down worsened the symptoms of plaintiff's mental illness. R.T. of December 9, 1991 at p. 17, 26. While locked down, plaintiff deteriorated psychiatrically. R.T. of November 25, 1991 at p. 149. This deterioration harmed plaintiff. R.T. of December 9, 1991 at p. 40; Exhibits H, 65.

DOC has ignored plaintiff's medical needs. R.T. of December 9, 1991 at p. 33. Plaintiff has undergone "gross mal- and mistreatment and lack of treatment over years" at DOC. R.T. of November 25, 1991 at p. 58. DOC's placement of plaintiff in lock down was inhumane. R.T. of December 9, 1991 at p. 16, 27; Exhibit A at p. 116, 123, 135. If plaintiff's treating psychiatrist at ASH had known that plaintiff would be placed in lock down upon discharge from the hospital, it would have changed his decision to transfer her back to DOC. R.T. of December 9, 1991 at p. 235–236. According to Dr. Garcia, in his eighteen years of psychiatric practice in correctional facilities, this is the most "poorly managed" case he has ever seen or of which he is aware. R.T. of December 9, 1991 at p. 42.

5. Defendants had knowledge of the harm caused by plaintiff due to their actions in failing to treat her condition.

Both defendants Fernandez and Vermeer had knowledge of the harm caused to plaintiff. DOC psychiatrists understand that prolonged lock down worsens symptoms of mental illness. Exhibit A at 50, 152–153. DOC psychiatric staff and security staff, including defendants Fernandez and Vermeer, knew about plaintiff's deterioration in lock down as such deterioration was documented throughout the medical records and incident reports. R.T. of December 13, 1991 at p. 43–44; Exhibit 72, 74, 75, D. Some of the incident reports that were forwarded to psychiatric staff, including Dr. Fernandez, documented behavior indicating that plaintiff was having psychiatric problems. Exhibits 21–23, 25–30, 32, 33, 35–52.

Moreover, defendant Lewis has had notice of the inadequacies of the prison system's mental care since at least January of 1990 when the class action case was filed in *Casey v. Lewis*, CIV 90–0054 PHX CAM.

6. Absent injunctive relief, there is a great likelihood that plaintiff will continue to be harmed by the defendants' failure to treat her illness.

If plaintiff is transferred back to Santa Maria, there is a great likelihood of irreparable harm to her mental health. Plaintiff should never be transferred to the Santa Maria Unit. R.T. of December 9, 1991 at p. 33. Dr. Potts testified that it would be inhumane to transfer plaintiff back to Santa Maria. R.T. of November 25, 1991 at p. 60. Based on the pattern of treatment of plaintiff by DOC, it is likely that plaintiff would be transferred to Santa Maria, placed in lock down unnecessarily and deprived of basic mental health treatment. R.T. of December 9, 1991 at p. 34–35, 39–40, 133; R.T. of November 25, 1991 at p. 60–61. If plaintiff is returned to the DOC and refuses to take her medication, she will be locked down. Exhibit A at 115, 123.

## CONCLUSIONS OF LAW

### I. Plaintiff's Civil Rights Claim

█ In order to prevail on a civil rights claim under 42 U.S.C. § 1983 because of inadequate medical care in violation of the eighth amendment right to be free from cruel and unusual punishment, a prisoner must establish "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 291–92, 50 L.Ed.2d 251 (1976); *Toussaint v. McCarthy*, 801 F.2d 1080, 1111 (9th Cir. 1986), *cert. denied*, 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987).

█ The indifference must be substantial to violate the constitution. *Jones v. Johnson*, 781 F.2d 769, 771 (9th Cir.1986). Mere claims of "indifference," "negligence," or "medical malpractice" do not support a claim under 42 U.S.C. § 1983.

*Estelle,* 429 U.S. at 106, 97 S.C.t at 292; *Broughton v. Cutter Laboratories,* 622 F.2d 458, 460 (9th Cir.1980). A mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference. *See May v. Enomoto,* 633 F.2d 164, 167 (9th Cir. 1980); *Shapley v. Nevada Bd. of State Prison Com'rs,* 766 F.2d 404, 407 (9th Cir. 1985). Nor does a difference in medical opinion amount to deliberate indifference. *Sanchez v. Vild,* 891 F.2d 240, 242 (9th Cir.1989).

■ Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay or intentionally interfere with medical treatment. *Wood v. Housewright,* 900 F.2d 1332, 1334 (9th Cir.1990).

The Ninth Circuit set forth the eighth amendment standards for physical, dental and medical care systems in *Hoptowit v. Ray,* 682 F.2d 1237, 1253 (9th Cir.1982) as follows:

> The Eighth Amendment requires that prison officials provide a system of ready access to adequate medical care. Prison officials show deliberate indifference to serious medical needs if prisoners are unable to make their medical problems known to medical staff. [Citation omitted] Access to the medical staff has no meaning if the medical staff is not competent to deal with the prisoners' problems. The medical staff must be competent to examine prisoners and diagnose illnesses. It must be able to treat medical problems or refer prisoners to others who can. Such referrals may be to other physicians within the prison, or to physicians or facilities outside the prison if there is reasonably speedy access to those other physicians or facilities. In keeping with these requirements, the prison must provide an adequate system for responding to emergencies. If outside facilities are too remote or too inaccessible to handle emergencies promptly and adequately, then the prison must provide adequate facilities and staff to handle emergencies within the prison. These requirements apply to physical, dental and mental health.

*Hoptowit,* 682 F.2d at 1253.

■■ Supervisory officials cannot be held liable under the theory of respondeat superior. *Monell v. Dept. of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). Rather, plaintiff must establish that the official personally participated in the constitutional deprivation or that a state supervisory official was aware of the widespread abuses and with deliberate indifference to the inmate's constitutional rights failed to take action to prevent further misconduct. *King v. Atiyeh,* 814 F.2d 565, 568 (9th Cir.1987); *Monell,* 436 U.S. at 691, 98 S.Ct. at 2036; *Williams v. Cash,* 836 F.2d 1318, 1320 (11th Cir.1988); *Fundiller v. City of Cooper City,* 777 F.2d 1436, 1443 (11th Cir.1985). However, officials may be independently liable under § 1983. *Id.* Officials can be held liable for their failure to implement a proper mental health care program or failure to adequately train or supervise subordinates. *Greason v. Kemp,* 891 F.2d 829, 836–37 (11th Cir.1990).

■ In this case, the parties have stipulated that plaintiff's mental illness presents a serious medical need. PTSF 6. Thus, plaintiff need only prove that the defendants were deliberately indifferent to her serious mental health needs. Plaintiff has met this burden.

The defendants have violated plaintiff's eighth amendment rights by failing to provide proper mental health treatment. The plaintiff established that because of her mental illness, she needs the therapeutic environment of a mental health treatment facility; however, such environment has not been provided by the DOC for nearly ten years. The defendants provided grossly inadequate mental health care for plaintiff. Rather, defendants placed plaintiff in lock down as punishment for the symptoms of her mental illness and as an alternative to providing mental health care.[2] The his-

---

**2.** The medical experts testified that plaintiff's hostile, threatening behavior for which she is placed in lock down is a symptom of her chronic paranoid schizophrenia. This conclusion is

tory of plaintiff's mental illness in prison clearly establishes that plaintiff is unable to function in general population at DOC.[3]

The mental health program at the Santa Maria Unit does not and cannot meet plaintiff's medical needs for several reasons. Santa Maria lacks adequate psychiatric staffing. Communication between security staff and psychiatric staff about patients is almost nonexistent. In addition, security staff overrides medical decisions of DOC psychiatrists. Santa Maria lacks an adequate system for behavior problems to be referred to psychiatric staff. As a result, prisoners are unable to make their medical problems known to medical staff. This demonstrates deliberate indifference to plaintiff's serious mental health care needs. *Hoptowit,* 682 F.2d at 1253.

Moreover, referrals to outside mental health care at ASH are not "reasonably speedy." DOC has *no* effective system to transfer mentally ill women to ASH when necessary. Transfers from Santa Maria to ASH take months when they could be accomplished in a day or two. Such referrals, if made, are delayed or never carried out by staff. This also demonstrates deliberate indifference to plaintiff's serious mental health care needs. *Hoptowit,* 682 F.2d at 1253.

Defendants Vermeer and Lewis have violated plaintiff's mental health care rights by failing to correct the inadequacies of the mental health care system for women. Defendant Vermeer had knowledge of the inadequate care and harm caused to plaintiff. Medical records and incident reports show that she was aware that plaintiff was locked down and plaintiff's mental condition deteriorated in lock down. Despite her knowledge of plaintiff's psychotic behavior in lock down, Defendant Vermeer did not act to change that system.

Defendant Lewis also has had notice of the inadequacies of the prison system's mental care since at least January of 1990 when the class action case was filed in *Casey v. Lewis,* CIV 90–0054 PHX CAM. However, he has failed to take corrective action.

Despite such notice, defendants Lewis and Vermeer failed to correct the problem. Such history of abuse and failure to take corrective action results in violation of the eighth amendment by the defendants. *Hunt v. Dental Dept.,* 865 F.2d 198, 200 (9th Cir.1989); *Fundiller,* 777 F.2d at 1443. By providing such "grossly inadequate" psychiatric care to the plaintiff, defendants have demonstrated deliberate indifference to her serious mental health needs. *Greason,* 891 F.2d at 835; *Waldrop v. Evans,* 871 F.2d 1030, 1033 (11th Cir.1989); *Hoptowit,* 682 F.2d at 1253.

The defendants also failed to provide any psychiatric treatment of plaintiff's condition while she was locked down. Although plaintiff should have been seen and evaluated by a psychiatrist immediately after locked down, this was never done. Nor was plaintiff seen by psychiatrists almost daily while in lock down as required for her mental condition.

 Defendant Vermeer did not effectively or consistently refer plaintiff to mental health staff when her security staff filed incident reports regarding plaintiff's psychotic behavior. Such failure to notify competent officials of an inmate's psychiatric state constitutes deliberate indifference. *Waldrop,* 871 F.2d at 1036.

---

confirmed by the testimony that antipsychotic medication and appropriate treatment results in plaintiff's behavior becoming non-hostile and non-threatening. Defendant Vermeer testified, and the DOC disciplinary records confirm, that plaintiff was locked down as punishment for her behavior. Lock down was not ordered by psychiatric personnel for therapeutic purposes. Psychiatrists did not authorize the lock down, monitor plaintiff while in lock down and could not order her release from lock down. Security staff, specifically defendant Vermeer who makes the final determination regarding lock down at Santa Maria, initiated, carried out and continued lock down of plaintiff.

3. Shortly after placement in general population, she is placed in lock down, her condition deteriorates and eventually, usually with an unacceptable delay, she is transferred to ASH. While she is in lock down, the DOC lacks adequate psychiatric staff to monitor her illness. When medical personnel recommend transfer to ASH, such transfer is delayed for months or never occurs.

■ Even when the incident reports were occasionally forwarded by defendant Vermeer to psychiatric staff, including Dr. Fernandez, the psychiatrists did not respond to the reports. Such failure to respond to a known medical problem constitutes deliberate indifference. *Waldrop,* 871 F.2d at 1036. In one instance, Dr. Fernandez did not respond, nor did any other mental health professional, to reports that plaintiff was screaming at monsters to get out of her room and saying that Lucifer told her to cut off her kid's heads.

In addition, the defendants did not respond to plaintiff's failure to take her medication, which results in the hostile, threatening behavior and subsequent lock down. Defendants did not involuntarily medicate plaintiff. Nor did they transfer her to ASH when she failed to take her medication voluntarily. Therefore, both defendants Vermeer and Fernandez violated plaintiff's eighth amendment rights by failing to respond to her known, severe mental condition. *Waldrop,* 871 F.2d at 1036.

## II. *Injunctive Relief*

■ "The basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982). Such determination requires a balancing between the conveniences of the parties and possible injuries to them as they may be affected by the granting or withholding of the injunction. *Yakus v. United States,* 321 U.S. 414, 410, 64 S.Ct. 660, 675, 88 L.Ed. 834 (1944).

■ The plaintiff has suffered harm in the past and such harm is likely to reoccur absent injunctive relief. At Santa Maria, plaintiff's mental condition consistently deteriorated and she suffered from hallucinations that seemed "very real and terrifying" to her. Based on the continuing cycle of lack of treatment, the harm is likely to reoccur as soon as she is transferred back into general population. If she is transferred back and refuses to take her medication, she will be placed into lock down and she may be kept there for months.

Because the conditions have not changed in Santa Maria, only the Flamenco unit or ASH can provide plaintiff with proper care. Although ASH can provide better care, that care is more restrictive. Flamenco is the less severe, restrictive alternative to ASH and the only alternative within the DOC where plaintiff can receive adequate care.

The harm to the Defendants of keeping plaintiff at the Flamenco unit is minimal compared to the harm to plaintiff's mental health if she is denied treatment. The Flamenco Unit is a DOC facility. At most, defendants are harmed as one less space is available in the Flamenco Unit for other women with severe mental problems.

The defendants' treatment of H.B. over the past ten years has been worse than grossly inadequate or inhumane. It has been barbaric. Over this period of time, the defendants have punished plaintiff for her mental illness by throwing her in the "hole" for periods of time up to a year and leaving her there without any mental care in a highly psychotic state, terrified because of hallucinations, such as monsters, gorillas or the devil in her cell. In fact, one psychiatric expert stated he wouldn't treat his dog the way the defendants treated H.B. Exhibit A at 125. Nor does it appear that plaintiff is the exception to the rule as seven to eight mentally ill women may be locked down at Santa Maria at any one time and may remain there for months without care. Such treatment of any human being is inexcusable.

IT IS THEREFORE ORDERED THAT:

(1) Defendants Lewis, Vermeer and Fernandez are ENJOINED from transferring plaintiff from Flamenco unit to the Santa Maria unit (Perryville) or any other DOC facility. If necessary to ensure adequate treatment, defendants shall transfer plaintiff to the Arizona State Hospital. Defendants shall take all steps necessary pursuant to A.R.S. §§ 31–226 and/or 31–226.01 to ensure adequate mental health treatment. Any such action shall be taken immediately upon a psychiatric determination of necessity of a transfer to ASH so that she may receive adequate treatment.

(2) Defendants Lewis, Vermeer and Fernandez are ENJOINED from placing plaintiff in lock down as punishment for behavior that is the result of her mental illness. Only DOC psychiatric staff may authorize placement of plaintiff in lock down. Plaintiff may be placed in lock down only if her behavior presents an immediate danger to self or others. If placed in lock down, DOC psychiatric staff shall monitor, evaluate and provide appropriate psychiatric follow-up in accordance with acceptable professional standards. All monitoring, evaluation and follow-up shall be documented in the medical records. If placed in lock down, plaintiff shall be released as soon as she is no longer a danger to herself or others.

(3) Defendants Lewis and/or Fernandez shall notify plaintiff's counsel within twenty-four hours if plaintiff is placed in lock down.

(4) Defendants Lewis and/or Fernandez shall notify plaintiff's counsel within forty-eight hours if plaintiff refuses her prescribed medication.

(5) Defendants Lewis and/or Fernandez shall notify plaintiff's counsel within twenty-four hours of a determination that plaintiff needs to be transferred to ASH to ensure adequate treatment. Upon a determination by ASH that plaintiff should be transferred back to DOC from ASH, Defendants Lewis or Fernandez shall notify plaintiff's counsel at least five working days prior to the transfer.

(6) Defendants Lewis and/or Fernandez shall provide monthly reports to plaintiff's counsel of the status of plaintiff's placement in lock down. If plaintiff has not been placed in lock down during the previous month, the report need only state that plaintiff was not placed in lock down. If plaintiff has been placed in lock down during the previous month, the report shall contain the dates of the lock down and reasons for lock down.

(7) Defendants Lewis and/or Fernandez shall permit plaintiff's counsel and experts reasonable access to interview, evaluate and monitor plaintiff at Flamenco. If plaintiff is placed in lock down, defendants shall permit her experts immediate access.

(8) As the prevailing party, plaintiff is entitled to her reasonable attorneys' fees. Counsel for plaintiff shall file her application for fees no later than September 18, 1992. Defendants shall file their response no later than September 25, 1992. Plaintiff shall file her reply no later than October 2, 1992.